**John BOOTH–EL, Petitioner**

v.

**Eugene M. NUTH, et al., Respondents**

**No. CIV.A. CCB–97–1252.**

United States District Court,
D. Maryland.

April 20, 2001.

Nevett Steele, Jr., Glyndon, MD, Michael A. Millermann, Baltimore, MD, David Walsh–Little, Law Office, Baltimore, MD, for Petitioner.

Annabelle L. Lisic, Office of the Attorney General, Baltimore, MD, for Respondents.

### MEMORANDUM

BLAKE, District Judge.

On August 17, 1990, petitioner John Booth–El was sentenced to death for his role in the murders of Irvin and Rose Bronstein. Currently before the court is Booth–El's Petition for Writ of Habeas Corpus. After considering the parties' briefs and arguments, the court concludes that the removal of diminished capacity as a result of intoxication as a statutory mitigating factor at Booth–El's 1990 re-sentencing violated the *Ex Post Facto* Clause. Accordingly, it will grant relief as to that claim.[1] Booth–El's remaining claims either were procedurally defaulted or do not provide a basis for relief. For the reasons that follow, therefore, the court will grant in part the Petition for Writ of Habeas Corpus.

### BACKGROUND

On May 20, 1983, the bodies of Irvin and Rose Bronstein were found in the living room of their West Baltimore home. Both were bound and gagged. Each had been stabbed twelve times. Their home had been ransacked. Property, including televisions, jewelry, and a 1972 Chevrolet Impala, was missing. Petitioner, John Booth–El, ("Booth–El"), and William "Sweetsie" Reid, ("Reid"), were charged with the murders.

Booth–El's first trial in 1984 ended in a mistrial because the prosecution had failed to turn over certain information prior to trial. *Booth v. State*, 301 Md. 1, 481 A.2d 505 (1984) (*"Booth I "*).

In a second trial[2] held in the fall of 1984, Booth–El was convicted of first de-

gree murder of Mr. and Mrs. Bronstein as well as two counts of robbery and one count of conspiracy. He was sentenced to death for the murder of Mr. Bronstein.

### Appellate Proceedings

On direct appeal Booth–El argued that:

1. The trial judge erred in refusing to strike for cause a juror who had heard that a prior guilty verdict had been reversed and who stated that he would give greater weight to the testimony of a police officer.

2. The trial judge erred by refusing to order a psychiatric evaluation of Veronda Mazyck, a state's witness.

3. The trial judge erred in admitting testimony by Eddie Smith that Reid admitted to killing some white people.

4. The trial judge gave an incorrect jury instruction on premeditation.

5. There was insufficient evidence to support the conspiracy to commit robbery conviction.

6. The trial judge improperly excluded potential jurors who opposed the death penalty.

7. The trial judge gave an erroneous instruction regarding the inferences that could be drawn from the possession of stolen property.[3]

His conviction and sentence were affirmed by the Maryland Court of Appeals. *Booth v. State*, 306 Md. 172, 507 A.2d 1098, 1103 (1986) (*"Booth II "*). The United States Supreme Court reversed the death sentence, finding the requirement of victim impact statements at sentencing violated the Eighth Amendment. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96

---

1. *See infra* Analysis, Claim III.

2. This trial and the 1988 and 1990 sentencing proceedings were in front of the Honorable Edward J. Angeletti. The first 1984 trial was in front of the Honorable James W. Murphy.

3. The appellant's brief is attached as Exhibit 31 to the State's Answer to the Petition for Writ of Habeas Corpus and Order to Show Cause. In that brief, Booth–El raised several other arguments which pertained to the 1984 sentencing proceeding and are not relevant to the instant petition.

L.Ed.2d 440 (1987), *overruled by Payne v. Tennessee,* 501 U.S. 808, 828–830, 111 S.Ct. 2597, 2610–11, 115 L.Ed.2d 720 (1991).

A new sentencing proceeding was held in 1988, and Booth–El again was sentenced to death. The sentence was vacated by the Maryland Court of Appeals because the trial judge had refused to admit evidence relating to parole eligibility. *Booth v. State,* 316 Md. 363, 558 A.2d 1205 (1989) (*"Booth III "*).

A third sentencing proceeding was conducted in the summer of 1990. Again, a death sentence was imposed.

On direct appeal, Booth–El argued that:

1. The trial judge erred in giving an *Allen*-type [4] instruction.

2. The trial judge erred by not bifurcating the sentencing proceeding.

3. His right to present mitigating evidence was violated by the trial judge's refusal to list non-statutory mitigating factors on the sentencing form and by the judge's refusal to allow him to testify under oath as to mitigating factors only.

4. The trial judge erred by not allowing the jury to consider imposition of a sentence of life without parole.

5. The trial judge erred in refusing to list on the sentencing sheet as a mitigating factor that the murder was committed while his capacity was substantially impaired by intoxication.

6. His right to allocution was unfairly denigrated by the trial judge's instruction and the prosecutor's closing argument.

7. The trial judge erred by allowing the prosecution to reveal remarks Booth–El made during allocution in the 1984 sentencing proceedings.

8. There was insufficient evidence to support the finding that he was a principal in the first degree.

9. There was plain error in the jury instruction on joint principals in the first degree.

10. The trial judge erred by refusing to allow three defense witnesses to testify as experts.

11. The trial judge erred by striking testimony that Booth–El has been raped while at Boys' Village.

12. The trial judge erred by not allowing Veronda Mazyck's probation officer to offer an opinion as to Ms. Mazyck's credibility.

13. Remarks by the prosecutor during rebuttal deprived him of a fair sentencing hearing.

14. The trial judge erred by refusing to recuse himself.[5]

The sentence was affirmed by the Maryland Court of Appeals. *Booth v. State,* 327 Md. 142, 608 A.2d 162 (1992) (*"Booth IV "*). *Certiorari* was denied by the United States Supreme Court in the fall of 1992. *Booth v. Maryland,* 506 U.S. 988, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992).

On July 12, 1993, Booth–El, through counsel, filed a petition for post-conviction relief in the Circuit Court for Baltimore City. In it he asserted:

1. Ineffective assistance of counsel during the guilt/innocence trial for:

a. Failing to present forensic evidence to rebut the State's theory of premeditation.

b. Failing to impeach the testimony of Eddie Smith, Veronda Mazyck, and Jewell Edwards Booth.

---

4. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

5. The appellant's brief is attached as Exhibit 38 to the State's Answer to the Petition for Writ of Habeas Corpus and Order to Show Cause.

c. Failing to investigate and develop the alternative theory of the case that the Bronsteins were killed by three men observed jumping a fence on the evening of the murders.

d. Failing to object to a jury pool which contained a biased and prejudiced panel.

e. Failing to ensure he received the maximum number of peremptory challenges then permitted by Maryland law.

f. Failing to request the removal of a juror—Gail Graves—who during the trial indicated she was afraid of being on the jury.

g. Failing to preserve any objections to the voir dire other than *Witherspoon*[6] issues and bifurcation.

h. Committing errors which, collectively, deprived him of a fair trial and amounted to ineffective assistance.

2. Ineffective assistance of guilt/innocence appellate counsel for:

a. Failing to order a complete transcript of the 1984 voir dire proceedings.

b. Failing to raise on appeal the issue of bias by the second jury panel.

c. Failing to raise on appeal the issue of the number of peremptory strikes.

d. Failing to raise on appeal the fact that, while two members of the second jury panel stated they had heard other panel members speaking about the case, no one on the panel admitted to having the conversations.

e. Committing errors which, collectively, prejudiced the outcome of the appeal and amounted to ineffective assistance.

3. Ineffective assistance of sentencing counsel for:

a. Failing to use the proper death qualification standard during voir dire.

b. Failing to preserve voir dire objections by using all peremptory strikes and objecting to the jury panel.

c. Failing to object to the prosecutor's reference to Booth–El as a "serial killer."

d. Committing errors which, collectively, deprived him of a fair hearing and amounted to ineffective assistance.

4. Ineffective assistance of sentencing appellate counsel for:

a. Failing to raise as an issue the striking of a juror, Laurel Gilbert, who indicated she had changed her mind about the death penalty.

b. Failing to raise the issue of the availability of Veronda Mazyck.

c. Failing to fully argue Judge Angeletti's refusal to recuse himself.

d. Failing to raise as an issue the prosecutor's use of the term "serial killer."

e. Failing to raise as an issue Judge ·Angeletti's *ex parte* communication with Ms. Gilbert.

f. Committing errors which, collectively, prejudiced the outcome of the appeal and amounted to ineffective assistance.

5. The prosecution withheld evidence, i.e., statements and an affidavit by Darryl Brooks and information concerning possible involvement by Charles Westry, in violation of the *Brady* rule.[7]

6. Violation of his due process right to a fair trial because:

a. The second jury panel was contaminated with extrinsic information by their discussions of the case.

b. Ms. Graves was allowed to remain on the jury after she indicated a predispo-

---

**6.** *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**7.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

sition to find Booth–El guilty by voicing fear.

c. The failure of appellate counsel to raise issues concerning jury selection amounted to a constructive denial of the right to counsel.

d. The prosecution committed misconduct by: i) coaching Veronda Mazyck's 1984 trial testimony and failing to make a good faith effort to find her in 1990 for the re-sentencing, ii) manipulating the testimony of Eddie Smith, a witness at the 1990 re-sentencing, to incriminate Booth–El, iii) coaching and threatening Jewell Edwards Booth in order to obtain inaccurate testimony at both the 1984 trial and 1990 re-sentencing, iv) engaging in conduct which, cumulatively, biased the outcomes of the 1984 trial and 1990 re-sentencing.

7. Violation of his *Miranda* rights in connection with a statement given to police on May 18, 1983.

8. Judge Angeletti's phone conversation with a juror, Laurel Gilbert, and subsequent striking of her without allowing counsel an opportunity to rehabilitate her, violated Booth–El's right of confrontation.[8]

Booth–El filed a *pro se* amendment to his post-conviction petition on March 18, 1994.[9] In it he asserted:

1. The trial court gave an erroneous reasonable doubt instruction in the 1984 guilt/innocence trial.

2. During the guilt/innocence trial the prosecution knowingly used false, perjured or misleading testimony by Jewell Booth and Veronda Mazyck; withheld evidence relating to the credibility of Ms. Mazyck; and withheld evidence relating to a pair of gloves found at the crime scene.

3. He was denied the right to be tried by a jury of his peers as defined in the *Dred Scott* decision.

4. He was denied the right to confront and cross examine witnesses when a statement by Willie Reid was introduced without a showing that Mr. Reid was unavailable.

5. Unspecified ineffective assistance of counsel.

6. Maryland sentencing procedures in capital cases are constitutionally deficient because they do not provide for a "mercy option."

7. The death penalty was sought in this case for racially biased reasons and is constitutionally disproportionate to other sentences for first degree murder in Baltimore City.

A hearing was held over several days in March 1994 in front of the Honorable Kathleen O'Ferrall Friedman. On December 22, 1994, Judge Friedman denied relief. (State's Answer, Ex. 52.) A timely application for leave to appeal was denied by the Maryland Court of Special Appeals on March 7, 1995.[10] (*Id.*, Ex. 53.) A

---

8. The appellant's brief is attached as Exhibit 46 to the State's Answer to the Petition for Writ of Habeas Corpus and Order to Show Cause. An amended petition was filed challenging the use of the gas chamber, the method of execution then used in Maryland. (State's Answer, Ex. 48.) In 1994 the statute was amended to provide for execution by lethal injection, 1994 Md. Laws ch. 5, rendering these claims moot.

9. The amendment was submitted as an attachment to Exhibit 62 to the State's Answer

to the Petition for Writ of Habeas Corpus and Order to Show Cause.

10. Post-conviction counsel filed an application for leave to appeal on Booth–El's behalf on January 20, 1995. (State's Answer, Ex. 53.) Booth–El filed a supplemental application *pro se* on January 27, 1995. Respondents have provided only portions of the supplemental application. (State's Answer, Ex. 71, Attachment B). Accordingly, it will be assumed that the supplemental application contained all of the claims in the *pro se* amendment to the post-conviction petition.

motion for reconsideration was denied on May 12, 1995. *Certiorari* was denied by the United States Supreme Court on October 2, 1995. *Booth v. Maryland,* 516 U.S. 897, 116 S.Ct. 251, 133 L.Ed.2d 176 (1995).

On April 3, 1996, Booth–El, through counsel, filed a motion to reopen the post-conviction proceedings. In it he requested the proceedings be reopened to address issues raised in his original petition but not addressed by the court; and to address 1) a *Brady* violation; 2) the improper use of Ms. Mazyck's trial testimony in the 1990 sentencing proceedings; 3) the trial judge's refusal to recuse himself; 4) the trial judge's conduct during the sentencing proceedings, which violated his right to a fair trial; and 5) his contention that it would be unconstitutional to execute him twelve years after he was first sentenced to death.[11] (State's Answer, Ex. 61.) Booth–El filed a *pro se* Amendment to the motion to reopen which presented legal argument but no new claims. (*Id.,* Ex. 66.)

Judge Friedman denied the motion to reopen on April 22, 1997. (*Id.,* Ex. 69.) Booth–El filed a timely application for leave to appeal to the Maryland Court of Appeals. On June 30, 1997, the Maryland Court of Appeals granted the application for leave to appeal and affirmed Judge Friedman's decision on all claims except for the one involving *Brady* material. On that claim it vacated her decision and remanded for consideration of the merits of the claim. *Booth v. State,* 346 Md. 246, 696 A.2d 440 (1997).

An evidentiary hearing was held on the *Brady* issue on October 16, 1997. On January 20, 1998, Judge Friedman issued a memorandum opinion denying relief on the *Brady* issue. Booth–El again sought leave to appeal. His application was denied on

April 7, 1998. *Booth v. State,* 349 Md. 421, 708 A.2d 681 (1998) ("*Booth V*").

### Booth–El's Habeas Claims

In this, his first federal habeas corpus petition, Booth–El raises the following claims:

1. He was denied due process when the trial judge refused to bifurcate the 1990 sentencing proceedings so that the jury would determine whether he was a first degree principal before any evidence regarding aggravating and mitigating factors was presented.

2. He was denied the right to have the sentencing jury consider all relevant mitigating evidence because the trial judge: a) refused to list certain non-statutory mitigating factors on the sentencing form; and b) the trial judge refused to allow him to testify under oath as to mitigating factors only.

3. The 1983 change to the Maryland death penalty statute that removed intoxication from the list of statutory mitigating factors violated the *Ex Post Facto* Clause.

4. The trial judge erred by giving an instruction on joint principals in the first degree, because there was no evidence of joint first-degree principalship.

5. There was insufficient evidence to support the finding that Booth–El was a first degree principal in the murder of Mr. Bronstein.

6. Not allowing the sentencing jury to consider the option of a sentence of life without parole deprived him of due process and rendered the sentencing proceedings unreliable in violation of the Eighth and Fourteenth Amendments.

7. The trial judge erred in giving an *Allen*-type charge to the sentencing jury

---

**11.** Booth–El also argued the post-conviction court erred in denying a continuance.

(State's Answer, Ex. 62 at 11–13.)

after it indicated that it was split on whether Booth–El was a first degree principal.

8. His constitutional right to confront witnesses was denied when the trial testimony of Veronda Mazyck was read to the sentencing jury; appellate sentencing counsel was ineffective for not raising this issue on direct appeal.

9. He was denied due process when the trial judge refused to recuse himself despite having personal knowledge concerning the availability of Ms. Mazyck.

10. Using his participation in a robbery both to sustain the felony murder conviction and as the sole aggravating factor warranting the death penalty renders his sentence unconstitutional.

11. The conduct of the trial judge during the sentencing proceedings violated Booth–El's right to a fair trial.

12. Maryland's failure to provide for automatic appellate review for ineffective assistance of counsel claims violates the Sixth, Eighth, and Fourteenth Amendments.

13. Execution of a prisoner who has spent nearly seventeen years on death row constitutes cruel and unusual punishment.

14. Ineffective assistance of counsel during his 1984 guilt/innocence trial for:

a. Not investigating or presenting forensic evidence regarding the prosecution's theory that two knives were involved and that Booth–El and Reid each killed one of the Bronsteins;

b. Failing to properly object to, and thus preserve for appeal, issues relating to bias or prejudice of the second jury panel;

c. Failing to request removal for cause of a juror, Gail Graves, who expressed fear for her family because she worked near the location of the crime;

d. Preserving for appeal only voir dire objections relating to bifurcation and *Witherspoon* violations and, thus, waiving all other objections;

e. Engaging in conduct that, taken cumulatively, amounted to ineffective assistance and deprived him of a fair trial.

15. Ineffective assistance of guilt/innocence appellate counsel for:

a. Failing to order a complete transcript of the 1984 voir dire proceedings;

b. Failing to raise the issue of bias in the second jury panel;

c. Failing to discover false answers given by two members of the second jury panel and failing to raise the issue on appeal.

16. Ineffective assistance of sentencing counsel for:

a. Failing to preserve voir dire objections by exhausting peremptory challenges or by objecting to the composition of the panel before the jury was sworn;

b. Failing to use proper death qualification standards during voir dire;

c. Failing to object to the prosecution's use of the term "serial killer" during its closing rebuttal;

d. Failing to adequately question Cessie Alphonso, a social worker called by the defense, about Booth–El's background.

17. Ineffective assistance of sentencing appellate counsel for:

a. Failing to raise on appeal the trial judge's *ex parte* communication with, and refusal to conduct additional voir dire of, a juror, Laurel Gilbert, after she indicated that she changed her mind about being able to impose the death penalty;

b. Failing to raise on appeal the prosecutor's use of the term "serial killer."

18. Booth–El's fundamental rights were violated when:

a. Extrinsic information was introduced to the sentencing jury panel;

b. A clearly biased juror, Ms. Graves, was included on the final panel;

c. The trial judge refused to permit the sentencing trial counsel to ask certain questions on voir dire;

d. He was constructively denied his right to counsel by his sentencing appellate attorney's failure to raise issues relating to the jury and jury panel on appeal;

e. His right to confront Ms. Gilbert concerning her change of mind on the death penalty was violated when the trial judge questioned her outside of Booth–El's presence and did not allow counsel an opportunity to rehabilitate her.

19. The prosecutor's remarks during closing rebuttal at the sentencing proceedings deprived Booth–El of a fair hearing in violation of the Due Process Clause.

20. At the guilt/innocence trial, the judge issued an erroneous instruction on reasonable doubt.

21. In violation of *Brady v. Maryland,* the prosecution failed to turn over certain evidence, i.e., a forensic report on a pair of gloves and a statement by Darryl Brooks, prior to the guilt/innocence trial.

22. In Maryland, the death penalty is imposed in an arbitrary, wanton, and freakish manner.

23. In Maryland, the death penalty is imposed in a racially discriminatory manner.

24. The combination of the unanimity requirement, Judge Angeletti's supplemental instruction on principalship, and the *Allen* charge violated Booth–El's constitutional rights.

## ANALYSIS

### Procedural Default

■ Before a petitioner may seek habeas relief in federal court, he must exhaust the remedies available in state court for each claim presented.[12] *See Rose v. Lundy,* 455 U.S. 509, 521–22, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider it. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999); 28 U.S.C. § 2254(b)-(c). In Maryland, depending on the nature of the claim, such review may be accomplished either by direct appeal or through post-conviction proceedings. Exhaustion is not required if the petitioner has no available state remedy at the time a federal petition is filed. *Teague v. Lane,* 489 U.S. 288, 297–98, 109 S.Ct. 1060, 1068, 103 L.Ed.2d 334 (1989); *Bassette v. Thompson,* 915 F.2d 932, 937 (4th Cir.1990).

■ Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether by failing to raise it on direct appeal or at post-conviction proceedings, or by failing to note a timely appeal, the claim may be procedurally defaulted.[13] *Coleman v. Thompson,* 501 U.S. 722, 749–50, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991) (fail-

---

**12.** The claim must be fairly presented to the state courts. Thus, both the operative facts and controlling legal principles must be presented. *Baker v. Corcoran,* 220 F.3d 276, 289 (4th Cir.2000) (citations and punctuation omitted), *cert. denied,* —— U.S. ——, 121 S.Ct. 1194, 149 L.Ed.2d 110 (2001).

**13.** The procedural default doctrine applies where a state court refuses to consider the

merits of a claim on procedural grounds or where procedural grounds would clearly bar consideration of the claim by a state court. *Teague,* 489 U.S. at 297–98, 109 S.Ct. at 1068. It does not apply if a state court fails to apply the bar and considers the merits of a claim. *County Court of Ulster v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979).

ure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 491, 106 S.Ct. 2639, 2647, 91 L.Ed.2d 397 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46–47, 93 S.Ct. 71, 74, 34 L.Ed.2d 194 (1972) (failure to raise claim during post conviction); *Bradley v. Davis*, 551 F.Supp. 479, 481 (D.Md.1982) (failure to seek leave to appeal denial of post-conviction relief). Claims may also be procedurally defaulted where a state court declines "to consider their merits on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir.), *cert. denied*, 526 U.S. 1095, 119 S.Ct. 1517, 143 L.Ed.2d 668 (1999). The requirement in Maryland that certain claims be presented on direct appeal, *see* Md. Ann.Code Art. 27, § 645A, is such an adequate and independent state procedural rule. *See Johnson v. Smith*, 981 F.Supp. 944, 947–48 (D.Md.1997).

 When invoked, the procedural default doctrine bars consideration of a claim in a federal petition for habeas corpus absent a showing of cause and prejudice or actual innocence. *Murray*, 477 U.S. at 494–95, 106 S.Ct. at 2649; *Wainwright v. Sykes*, 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). To avoid a procedural default, however, the cause shown must be more than ignorance or a mistake. In some circumstances, ineffective assistance of counsel as deter-

mined under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), may be sufficient cause.[14] *See Edwards v. Carpenter*, 529 U.S. 446, 450–51, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000). Otherwise, "[i]n order to demonstrate 'cause' for the default, [petitioner] must establish 'that some objective factor external to the defense impeded counsel's [or petitioner's] efforts' to raise the claim in state court at the appropriate time." *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir.) (quoting *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645), *cert. denied*, *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). Ignorance of the availability of an appeal in a collateral proceeding, even when based on erroneous legal advice, is not cause for failing to file a timely appeal. *See Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir.1993).

 Even where a petitioner fails to show cause and prejudice for a procedural default, a court may still reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314–15, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995). The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496, 106 S.Ct. at 2649.[15] Thus, the miscarriage

---

**14.** Ineffective assistance of counsel in proceedings, such as post conviction, where representation by counsel is not constitutionally mandated, is not cause for a procedural default. *Coleman*, 501 U.S. at 752, 111 S.Ct. 2546. The fact that certain types of claims may only be raised in post-conviction proceedings does not create a limited constitutional right to counsel in those proceedings which would permit ineffective assistance to constitute cause. *See Mackall v. Angelone*, 131 F.3d 442, 449 (4th Cir.1997), *cert. denied*, 522 U.S. 1100, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998).

**15.** In capital cases, it is also possible to present a claim of actual innocence of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 345, 112 S.Ct. 2514, 2522, 120 L.Ed.2d 269 (1992); *Smith v. Murray*, 477 U.S. 527, 537–38, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986). Such a claim involves either showing that there was no aggravating circumstance or proving the absence of some other condition of eligibility for the death penalty. *Sawyer*, 505 U.S. at 345, 112 S.Ct. at 2522. To succeed, the petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find

of justice standard is directly linked to innocence. *Schlup,* 513 U.S. at 321, 115 S.Ct. at 864. Innocence, however, is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993). " 'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson,* 523 U.S. 538, 559, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865).

### *Standard of Review*

Effective April 24, 1996, the Anti–Terrorism and Effective Death Penalty Act of 1996 amended 28 U.S.C. § 2254(d) to provide that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is contrary to clearly established federal law if a state court applies a rule that contradicts Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result ...." *Williams v. Taylor,* 529 U.S. 362, 406, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000). Further "[a] state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision involv[ing] an unreasonable application of ... clearly established Federal law." *Id.* at 407–08, 120 S.Ct. at 1520. *See also Bell v. Jarvis,* 236 F.3d 149, 157 (4th Cir.2000); *Vick v. Williams,* 233 F.3d 213, 216 (4th Cir.2000); *Fisher v. Lee,* 215 F.3d 438, 447 (4th Cir.2000). Thus, habeas corpus relief may not be granted simply because a federal court determines that a state court erroneously or incorrectly applied clearly established federal law. *Williams,* 529 U.S. at 411, 120 S.Ct. at 1522 (O'Connor, J. for the Court). However, "a state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000).

### *Bifurcation of Sentencing Proceedings: Claim I*

To be eligible for the death penalty under Maryland law, a defendant must be a principal in the first degree except in cases of murder for hire. Md.Code. Ann. Art. 27, § 413(e)(1). The sentencing judge or jury decides whether the defendant was a principal in the first degree. If the sentencing judge or jury determines that the defendant is not a principal in the first degree, a sentence of life imprisonment is imposed. If it is determined that the defendant is a principal in the first degree, the sentencing judge or jury then deter-

him eligible for the death penalty ...." *Id.* at 348, 112 S.Ct. at 2523.

mines and weighs aggravating and mitigating circumstances. *See* Md. Rule 4–343.

Evidence concerning principalship and aggravating/mitigating circumstances generally is presented during a single proceeding after completion of the trial. Prior to his 1990 sentencing, Booth–El requested that the proceeding be bifurcated so that the jury would determine whether he was a principal in the first degree prior to hearing any evidence relating only to aggravating or mitigating factors. (State's Answer, Ex. 13 at 80–93.) His request was denied. (*Id.* at 104–05.)

 Booth–El argues that the failure to bifurcate the sentencing proceedings violated his constitutional right to due process. First, he asserts that the proceedings were so infected with unfairness as to violate his right to due process because the sentencing jury heard evidence concerning his criminal record, drug addiction, and psychological characteristics before determining whether he was a principal in the first degree. In making this argument, Booth–El relies upon *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).[16] Second, relying on *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), Booth–El asserts the unitary sentencing proceeding itself violates due process because: 1) he has a significant private interest in the outcome of the proceeding; 2) there is a significant risk that the jury will improperly consider prejudicial information relevant only to aggravating/mitigating factors when deciding principalship; and 3) while there might be additional fiscal and administrative burdens on the government in using bifurcated sentencing proceedings, the potential risk to the defendant outweighs the additional burden on the government.

Booth–El raised the failure to bifurcate claim on direct appeal. At that time, the focus of his claim was that the trial judge had erred in deciding he did not have the authority to bifurcate the proceeding. (State's Answer, Ex. 38 at 41–53.) To the extent he made a constitutional argument, Booth–El relied upon *Gregg v. Georgia*, in which the Court discusses the advantages of bifurcating the guilt and sentencing phases of capital trials. 428 U.S. 153, 190–92, 96 S.Ct. 2909, 2933–34, 49 L.Ed.2d 859 (1976). Although Booth–El's constitutional argument was not well defined on direct appeal, his claim that he was prejudiced by the decision to allow the jury to consider information from his presentence report before determining principalship, (State's Answer, Ex. 38 at 42–44), is essentially the same as the *Donnelly* argument raised in the present petition. Although it is a closer call, his challenge to the constitutionality of the prohibition on bifurcated sentencing proceedings, (*id.*, Ex. 38 at 51 n. 10), adequately raised the claim based upon *Mathews* presented in this petition.

The Maryland Court of Appeals concluded that Judge Angeletti was correct in finding that he did not have the authority to bifurcate the sentencing proceeding. In rejecting the constitutional claim, the Court held:

> Booth suggests that refusal further to bifurcate would violate the eighth amendment because principalship is an issue of guilt, rather than an issue of penalty, and *Gregg v. Georgia* ... suggested that issues of guilt should be decided separately in a bifurcated proceeding. But Booth had been found guilty of murder in the first degree before the sentencing proceeding began.

*Booth IV*, 608 A.2d at 171. This decision is not an unreasonable application of clear-

---

**16.** *Donnelly* involved the propriety of a remark made by the prosecutor during closing argument. 416 U.S. at 640–41, 94 S.Ct. at 1870.

ly established federal law. *See Grandison v. Corcoran,* 225 F.3d 654, 2000 WL 1012953 *14 (4th Cir. July 24, 2000) (unpublished), *pet. for cert. filed* —— U.S. ——, 121 S.Ct. 1658, —— L.Ed.2d —— (2001).

### Consideration of Mitigating Evidence: Claim II

#### A. Verdict Sheet

█ Maryland law specifies a number of mitigating factors and explicitly permits consideration of "any other facts which the jury or the court specifically sets forth in writing that it finds as a mitigating circumstance in the case." Md. Ann.Code Art. 27, § 413(g)(8). At sentencing, Booth–El requested that the non-statutory mitigating factors he presented be listed on the verdict sheet. That request was denied. (State's Answer, Ex. 23 at 209.)

Booth–El argues that Judge Angeletti's refusal to list the non-statutory mitigating factors impeded his right to have the jury consider evidence in mitigation of punishment. On direct appeal, the Maryland Court of Appeals concluded the Constitution does not require that non-statutory mitigating factors be listed on the verdict sheet. *Booth IV,* 608 A.2d at 171–72.

The Supreme Court has held that the sentencer in a capital case cannot be "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Mills v. Maryland,* 486 U.S. 367, 374, 108 S.Ct. 1860, 1865, 100 L.Ed.2d 384 (1988) (emphasis omitted) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)). *See also McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) ("Any barrier to [consideration of mitigating evidence] must therefore fall."). Similarly, "the sentencer may not refuse to

consider or be precluded from considering any relevant mitigating evidence ...." *Mills,* 486 U.S. at 374–75, 108 S.Ct. at 1865 (emphasis, internal citations, and quotations omitted). Booth–El contends that the sentencing court's failure to list non-statutory mitigating factors on the sentencing form violated *Mills, McKoy,* and similar holdings by forcing the jury: "(1) to decide whether [the potentially mitigating] evidence met each juror's personal test for what evidence should be weighed as a mitigating circumstance and (2) to then articulate that evidence as a mitigating circumstance that could be considered in weighing [the] sentence." (Petition at 28–29.)

The Supreme Court's "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998). To determine whether jury instructions satisfy this principle, the reviewing court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)).

In this case, there is no reasonable likelihood that the jury applied the instruction in a manner that precluded the consideration of mitigating factors or any other constitutionally relevant evidence. Admittedly, a juror first had to find that each non-statutory mitigating factor argued by the defense was mitigating before giving it consideration. The Supreme Court, however, has "never ... held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id. See also Weeks*

*v. Angelone,* 528 U.S. 225, 233, 120 S.Ct. 727, 732, 145 L.Ed.2d 727 (2000). In fact, the Supreme Court has upheld the use of a "catch-all" category in which the jury can consider any mitigating factor not expressly listed on the verdict form. *See Weeks,* 528 U.S. at 232 & n. 2, 120 S.Ct. at 732; *Boyde,* 494 U.S. at 380–82, 110 S.Ct. at 1198–99.

Maryland's system for presenting mitigating evidence does not preclude consideration of any factor that the jury, or any particular juror, may consider mitigating. If an individual juror is convinced that a particular factor is mitigating and that the defense has proven it, she is free to credit that mitigating factor and weigh it against the aggravating factors in determining the sentence. Thus, unlike *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), two cases cited by Booth–El, the jurors in Booth–El's case were allowed to consider all potentially mitigating evidence and to give it whatever weight they chose.

The last sentence of paragraph 8(b) of Section IV of the verdict sheet states: "If the jury or any juror determines that one or more mitigating circumstances exist, complete Section V." (State's Answer, Ex. 39 at 179.) After the jury returned with its verdict, Judge Angeletti required them to go back and complete Section V. (*Id.,* Ex. 26 at 4–5.) In his supplemental memorandum, Booth–El argues that, because Section V was completed, the jury must have found a mitigating factor, and the fact that no such factor was listed in Part IV indicates the jury was confused. (*See* Pet'r Suppl. Mem. at 9–10.)

This argument is without merit. The Court of Appeals explained the jury form used in Booth–El's sentencing:

Section IV, Question 8(a) of the sentencing form submitted to Booth's jury stated: "We unanimously find by a preponderance of the evidence that the following additional mitigating circumstances exist." Question 8(b) read: "One or more of us, but fewer than all 12, find by a preponderance of the evidence that the following additional mitigating circumstances exist." Section V of the sentencing form provided:

"Each individual juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating circumstances found by that individual juror to exist."

"We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstances marked 'proven' in Section III outweigh the mitigating circumstances in Section IV. [Yes or No]"

*Booth IV,* 608 A.2d at 172. Question 8(b) of Section IV explicitly states that the finding of a particular mitigating circumstance need not be unanimous. Rather, "[o]ne or more" of the jurors, "but fewer than all 12," can find that a mitigating circumstance exists. Section V reinforces this point by telling each individual juror to weigh the aggravating circumstances "against any mitigating circumstances found by that individual juror to exist."

The likely result is that no juror found any circumstances proven which should be considered mitigating and, therefore, did not list a mitigating circumstance in Section IV. The jury then correctly followed the instructions in paragraph 8(b) and did not complete Section V. Judge Angeletti, in an attempt to guarantee that the jury completed the entire form, however, asked the jury to complete Section V. While that final instruction may have been in error, it

does not indicate that the jury was confused by the form.

Booth–El is correct in stating that "we do not know if the Judge instructed the jury to fill out Section V because of information submitted on individual forms as to statutory or non-statutory mitigating factors or because he just thought it should be filled out." (Pet'r Suppl. Mem. at 10.) The Supreme Court, however, does not require a reviewing court to be certain that the jury correctly applied the instructions. Rather, the court need only determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Buchanan*, 522 U.S. at 276, 118 S.Ct. at 761 (quoting *Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198). Here, no such reasonable likelihood exists. Thus, the Maryland Court of Appeals' conclusion is not an unreasonable application of clearly established federal law.

## B. Mitigation Testimony

■ During his sentencing, Booth–El requested permission to testify as to mitigation without being cross-examined about the events of May 1983. (State's Answer, Ex. 22 at 218.) His request was denied. (*Id.* at 219–21.) Booth–El did not testify, though he briefly addressed the jury during closing arguments. (*Id.*, Ex. 24 at 92–95.) Judge Angeletti instructed the jury that Booth–El's statement was not testimony or evidence. (*Id.* at 61–62.) That instruction was repeated by the prosecution during its closing argument. (*Id.* at 125.)

Booth–El argues he should have been permitted to testify regarding mitigating evidence without subjecting himself to cross-examination on the circumstances surrounding the crime. On direct appeal, the Court of Appeals concluded he had no constitutional right to testify without being

cross-examined. *Booth IV*, 608 A.2d at 172–73.

Although the Supreme Court apparently has never addressed the issue, the Fourth Circuit has held that a criminal defendant does not have a constitutional right to allocute before a sentencing jury. *See United States v. Barnette*, 211 F.3d 803, 820 (4th Cir.2000) (citing *United States v. Hall*, 152 F.3d 381 (5th Cir.1998)). Given that a criminal defendant does not have a constitutional right to give an *unsworn* statement to the sentencing jury without subjecting himself to cross-examination, the Maryland Court of Appeals' holding that Booth–El did not have a constitutional right to give a *sworn* statement is not contrary to Supreme Court precedent.

### Deletion of Intoxication as a Statutory Mitigating Factor: Claim III

■ At the time of the Bronsteins' murders, Maryland's death penalty statute listed seven mitigating circumstances, including:

> The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication.

Md. Ann.Code Art. 27, § 413(g)(4) (1957). Effective July 1, 1983, the words "or intoxication" were removed from this section. 1983 Md. Laws ch. 296. Both before and after the 1983 change, the statute contained a catch-all provision which allowed the jury to consider "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." Md. Ann.Code Art. 27, § 413(g)(8) (1957, 2000). The Maryland Court of Appeals described the effect of the 1983 change as follows:

Prior to the 1983 enactment the burden was on the murderer to prove by a preponderance of the evidence diminished capacity as a result of intoxication. If the jury found that fact, then the statute determined that that circumstance was mitigating and that it was to be considered in weighing whether the aggravating circumstance outweighed intoxication and any other mitigating circumstances. After the change, the murderer has the burden of proving by a preponderance of the evidence both 'the fact of diminished capacity due to intoxication and that that fact is a mitigating circumstance.

*Booth IV,* 608 A.2d at 175 (citations omitted).

During the 1990 sentencing proceedings, Booth–El requested that the verdict form contain the pre-July 1, 1983 language.[17] (State's Answer, Ex. 39 at 48–51.) That request was denied.

On direct appeal, Booth–El argued that the refusal to include the pre-July 1, 1983 language on the verdict sheet violated the *Ex Post Facto* Clause because it required him to prove by a preponderance of the evidence that intoxication was a mitigating circumstance. (*Id.,* Ex. 38 at 75–81.) The Court of Appeals found that the change did not fit within any of the "three" categories of *ex post facto* laws defined in *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). *Booth IV,* 608 A.2d at 175. It also concluded that the change was procedural and that "[n]one of the purposes of the prohibition against *ex post facto* laws would be served by applying the prohibition" in this case. *Id.* at 175, 177.

Article I, § 10 of the U.S. Constitution provides that "[n]o State shall ... pass any ... ex post facto Law." In 1798, Justice Chase described four categories of

laws that he believed ran afoul of this provision:

1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The continuing vitality of these four categories recently was affirmed by the Supreme Court in *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). In *Carmell,* the Court held that an amendment to a Texas statute deleting the requirement that a victim's testimony be corroborated in certain sexual assault cases violated the *Ex Post Facto* Clause. Explaining the importance of the fourth *Calder* category, the Court stated:

A law reducing the quantum of evidence required to convict an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof. In each of these instances, the government subverts the presumption of innocence by reducing the number of elements it must prove to overcome that presumption; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or by making it easier to meet the threshold for overcoming the presump-

---

**17.** According to the motion, the pre-July 1, 1983 language was included on the verdict sheet at his 1984 trial. (State's Answer, Ex. 39 at 48.)

tion. Reducing the quantum of evidence necessary to meet the burden of proof is simply another way of achieving the same end.

*Id.* at 532–33, 120 S.Ct. at 1632–33. The change in the statute that was applied to Booth–El, which effectively lowered the prosecution's burden of proof by increasing the burden placed on the defendant, falls within the fourth *ex post facto* category.

The Maryland Court of Appeals' failure in *Booth IV* to recognize the fourth *Calder* category no doubt was the result of what the Court in *Carmell* described as "rather cryptic" language in *Collins,* a decision issued shortly before Booth–El's 1990 resentencing. *Carmell,* 529 U.S. at 538, 120 S.Ct. at 1635. In *Collins,* the Court found that a Texas statute allowing an appellate court to reform an improper sentence rather than order a new trial did not violate the *Ex Post Facto* Clause. 497 U.S. at 52, 110 S.Ct. at 2724. *Collins* began by quoting the four *Calder* categories, but also described the three-category formulation in *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), as a "faithful" rendition of the "original understanding" of the Clause, even though it omitted the fourth *Calder* category. *See Carmell,* 529 U.S. at 538, 120 S.Ct. at 1635 (quoting *Collins,* 497 U.S. at 43, 110 S.Ct. at 2719). *Collins* continued by specifically overruling the Court's decisions in *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), which had expanded the four *Calder* categories to cover laws which "in relation to the offense or its consequences, alter[ ]the

situation of a party to his disadvantage." *Kring,* 107 U.S. at 228–29, 2 S.Ct. at 449 (citation omitted).[18] *Collins* did not, however, overrule *Calder.* In response to the argument made by Texas and the United States in *Carmell* that the fourth category had been "effectively cast out," the Court emphatically replied that *"Collins* held no such thing." *Carmell,* 529 U.S. at 537, 120 S.Ct. at 1635. Indeed, even in *Collins,* the Court explained that "the prohibition which may not be evaded is the one defined by the *Calder* categories." 497 U.S. at 46, 110 S.Ct. at 2721. Accordingly, the Maryland Court of Appeals' conclusion that the statutory amendment in Booth–El's case did not fit into any of the *ex post facto* categories violates Supreme Court precedent and therefore is contrary to clearly established federal law. *See Williams,* 529 U.S. at 406, 120 S.Ct. at 1519–20.

■ A further step in the analysis, however, is required. "Procedural" changes, even those which disadvantage a defendant, do not fall into any of the four *Calder* categories and therefore do not violate the *Ex Post Facto* Clause. *See Dobbert v. Florida* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977). The court in *Booth IV* concluded that the change in the statute was merely procedural. 608 A.2d at 177. It did so, however, without the benefit of recognizing the existence and significance of the fourth *Calder* category.

■ Procedural changes are "changes in the procedures by which a criminal case is adjudicated, as opposed to

**18.** In *Kring,* the defendant pled guilty to second-degree murder at a time when, under Missouri law, the guilty plea operated as an acquittal of the first-degree murder charge. The law was changed subsequently and, at his retrial, the court refused to accept the defendant's plea; he was tried and convicted of

first-degree murder and sentenced to death. 107 U.S. at 222–23, 2 S.Ct. at 444–45. The Supreme Court overturned his conviction. Similarly, in *Thompson,* the Court found that a statute reducing the size of criminal juries from 12 to 8 constituted an *ex post facto* law. 170 U.S. at 352–53, 18 S.Ct. at 623.

changes in the substantive law of crimes." *Collins*, 497 U.S. at 45, 110 S.Ct. at 2720. Procedural changes include those relating to the admissibility of evidence, *see Hopt v. Utah*, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884) (witness competency); *Thompson v. Missouri*, 171 U.S. 380, 386–87, 18 S.Ct. 922, 924–25, 43 L.Ed. 204 (1898) (handwriting comparisons), as well as those affecting the way in which a case is adjudicated, *see Dobbert*, 432 U.S. at 292, 97 S.Ct. at 2297 (change in jury's function in death penalty cases); *Beazell*, 269 U.S. at 170, 46 S.Ct. at 68–69 (requirement of joint trials for persons jointly indicted); *Mallett v. North Carolina*, 181 U.S. 589, 597, 21 S.Ct. 730, 733, 45 L.Ed. 1015 (1901) (change permitting the state to appeal the grant of a new trial); *Gibson v. Mississippi*, 162 U.S. 565, 590, 16 S.Ct. 904, 910, 40 L.Ed. 1075 (1896) (juror qualification). The change in § 413(g)(4) of the Maryland law is not procedural. It does not alter the type of evidence that is admissible during the sentencing proceeding, nor does it merely change the procedure for determining mitigating circumstances. Rather, it imposes on the defendant an additional burden, i.e., he must now show not only that intoxication substantially impaired his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law, but also that this constitutes a mitigating circumstance.[19] The amendment thus imposes an impermissible change in the amount or degree of proof. *See Carmell*, 529 U.S. at 540–41, 120 S.Ct. at 1636–37; *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 328, 18 L.Ed. 356 (1866) (striking down loyalty oath requirement of state constitution); *see also Gall v. Parker*, 231 F.3d 265, 305–06 (6th Cir.2000) (finding that state court decisions removing the state's burden to prove the absence of extreme emotional distress as an element of murder were equivalent to an *ex post facto* violation).[20]

While the court in *Booth IV* reviewed many of the Supreme Court's decisions involving changes that were found to be procedural, it did so without analyzing the change in the burden of proof effected by the amendment in this case. This is illustrated by its analysis of *U.S. v. Mest*, 789 F.2d 1069 (4th Cir.1986), a case involving an insanity defense to a murder prosecution where the offense was committed prior to enactment of the Insanity Defense Reform Act ("IDRA"), but the trial was conducted thereafter. The *Booth IV* court reviewed the IDRA's change in the Federal Rules of Evidence, which was found not to violate the *Ex Post Facto* Clause, but did not distinguish the change in the burden of proof and the definition of insanity brought about by the IDRA, which the parties agreed were "substantive," and the court did not apply retroactively. *Id.* at 1073 n. 3. *See also United States v. Lakey*, 610 F.Supp. 210, 213–14 (S.D.Tex.1985)

---

**19.** The significance of this change to the jury's deliberation process is indicated, in part, by the trial court's instructions to the jury that: "You are not to consider, I repeat, you are not to consider intoxication from alcohol or drugs in mitigating circumstance Number 4. You may, however, consider that in mitigating circumstance number 8, if you so choose." *Booth IV*, 608 A.2d at 177. As this instruction indicates, under the prior law, jurors were required to recognize intoxication as a mitigating factor, once it was proved, rather than being permitted to conclude that

intoxication need not be considered in mitigation of the potential death sentence.

**20.** The fact that a defendant might have received the same sentence under the prior law does not insulate the law from *ex post facto* review. *See Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937) ("It is true that petitioners might have been sentenced to fifteen years [the sentence actually received] under the old statute. But the *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed.").

(holding retroactive application of IDRA would violate the *ex post facto* clause); *United States v. Kowal,* 596 F.Supp. 375 (D.Conn.1984) (same).

The Maryland Court of Appeals made several other arguments to bolster its conclusion that the change in the Maryland statute did not constitute an *ex post facto* law. First, the court stated that the purposes for the prohibition of *ex post facto* laws would not be served by applying the prohibition in Booth–El's case. The court stated that "[Booth's] reliance interest [on the benefits of being intoxicated while he murdered] hardly deserves mention, let alone respect." *Booth IV,* 608 A.2d at 177 (quoting L. Tribe, *American Constitutional Law* § 10–3, at 640 (2d ed.1988)). The Supreme Court, however, has explicitly rejected this justification. In *Carmell,* the Court stated that "the absence of a reliance interest is not an argument in favor of abandoning the [fourth] category itself." 529 U.S. at 531 n. 21, 120 S.Ct. at 1632 n. 21.

> If [the absence of a reliance interest were enough to abandon the fourth ex post facto category], the same conclusion would follow for *Calder*'s third category (increases in punishment), as there are few, if any, reliance interests in planning future criminal activities based on the expectation of less severe repercussions.

*Id.*

The Maryland Court of Appeals also stated that there was no risk of legislative abuse in Booth–El's case because, based on the timing of the bill's introduction, "the Legislature could not have, and did not, contemplate John Booth when it deleted intoxication as an express mitigating circumstance on the sentencing form." *Booth IV,* 608 A.2d at 178. Though this statement is true, the law may still be *ex post facto.*[21] The Supreme Court has shown concern with alterations that only benefit the government. *See Carmell,* 529 U.S. at 532–33 & n. 23, 120 S.Ct. at 1632–33 & n. 23. Here, by eliminating diminished capacity resulting from intoxication as an automatic mitigating factor upon proof of that diminished capacity, the legislature has benefitted only the state. Therefore, this law is not one that is "ordinarily evenhanded, in the sense that [it] may benefit either the State or the defendant in any given case." *Id.* at 533 n. 23, 120 S.Ct. at 1633 n. 23.

This fact distinguishes Booth–El's case from *Dobbert,* which is relied upon by the State. In *Dobbert,* a jury in a death penalty case recommended life imprisonment. 432 U.S. at 287, 97 S.Ct. at 2295. At the time the murder was committed, this recommendation would have been binding. *Id.* at 294, 97 S.Ct. at 2299. By the time that Dobbert stood trial, however, the law was changed, such that a jury's recommendation of a sentence in a death penalty case was advisory only. *Id.* at 290–92, 97 S.Ct. at 2297. The judge overruled the jury and imposed the death sentence. *Id.* at 287, 97 S.Ct. at 2295.

In *Dobbert,* the change in the law could just as easily have benefitted the defendant as the government. The jury could have imposed death and been overruled by a judge who felt that life imprisonment was more appropriate. The *Dobbert* Court emphasized this fact in upholding the law as applied to the defendant. According to the Court:

> [T]he new statute affords significantly more safeguards to the defendant than did the old. Death is not automatic, absent a jury recommendation of mercy, as it was under the old procedure . . . . Perhaps the ultimate proof of this fact is

---

**21.** In fact, most laws that violate the *Ex Post Facto* Clause when applied to a particular defendant probably were passed without the legislature considering that particular defendant.

that this old statute was held to be violative of the United States Constitution ... while the new law was upheld by this Court ....

*Id.* at 2299–2300. The ameliorative quality of the law in *Dobbert* is absent from the change in Maryland's law.[22]

Finally, *Carmell* emphasizes "fundamental justice" as a principal interest to be served by the *Ex Post Facto* Clause:

There is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.

529 U.S. at 533, 120 S.Ct. at 1633. This interest was not discussed by the court in *Booth IV.*

█ I have considered carefully whether the *Booth IV* court's decision can be termed an unreasonable application of clearly established federal law, *see Williams,* 529 U.S. at 406, 120 S.Ct. at 1519–20, particularly in light of the strong dissent in *Carmell* and the "cryptic" language in *Collins.* It is critical to my conclusion that the dissent in *Carmell,* while it disagreed with the majority's interpretation of the Texas statute, and indeed questioned the applicability of the *Ex Post Facto* Clause to changes in evidentiary rules, nonetheless advanced an understanding of the fourth *Calder* category that applies to the change at issue in *Booth IV:*

Laws that reduce the burden of persuasion the prosecution must satisfy to win a conviction may not be applied to offenses committed before their enactment.

529 U.S. at 572, 120 S.Ct. at 1653 (Ginsburg, J. dissenting). This description includes "a statute retroactively increasing the defendant's burden of persuasion as to an affirmative defense." *Id.* at 572, 120 S.Ct. at 1653–54. Accordingly, the *Booth IV* court's acknowledgment that the change placed an additional burden on the defendant, 608 A.2d at 175, combined with its failure to recognize that the change thereby violated the *Ex Post Facto* Clause, constitutes an unreasonable application of clearly established federal law. On this issue, the petitioner is entitled to relief.[23]

---

**22.** Of course, this conclusion does not imply that the Maryland law itself is unconstitutional. Rather, it supports a finding that the change is unconstitutional as applied to Booth–El.

**23.** The State argues that, in this claim, Booth–El seeks application of a new rule of law which is not applicable retroactively and, therefore, is barred by *Teague v. Lane,* 489 U.S. at 310, 109 S.Ct. at 1075. (State's Answer at 35–36.)

To apply *Teague,* a federal court engages in a three-step process. First, it determines the date upon which the defendant's conviction became final. Second, it must '[s]urve[y] the legal landscape as it then existed,' and 'determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.' Finally, if the court determines that the habeas petitioner seeks the benefit of a new rule, the court must consider whether the relief sought falls within one of the two narrow exceptions to nonretroactivity.

*Lambrix v. Singletary,* 520 U.S. 518, 527, 117 S.Ct. 1517, 1524, 137 L.Ed.2d 771 (1997) (internal citations omitted); *see also United States v. Sanders,* 247 F.3d 139, 146 (4th Cir.2001).

Booth–El's death sentence became final on November 16, 1992 when *certiorari* was denied by the Supreme Court. *See Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070). Booth–El's *ex post facto* claim is not based upon a new rule of law. Rather, he seeks application of a very old rule, i.e., the fourth *Calder* category. While his claim is

### Jury Instruction on Joint First–Degree Principals: Claim IV

At sentencing, Judge Angeletti instructed the jury:

A principal in the first degree, again, is the immediate perpetrator of the crime while a principal in the second degree is one who did not commit the crime with his own hands, but was present aiding and abetting the perpetrator.

Under Maryland law, only a principal in the first degree may be sentenced to death.

You are further instructed that if you find from the evidence that two people inflicted the fatal wound, you may find that they are joint principals in the first degree.

(State's Answer, Ex. 24 at 27–28.) No exception was taken to this instruction. Booth–El argues, however, that the instruction was plain error because there was no evidence to support a finding that more than one person inflicted the injuries that resulted in Mr. Bronstein's death.

On direct appeal, the Maryland Court of Appeals concluded that the evidence that more than one person murdered Mr. Bronstein was sufficient to justify an instruction on joint principals in the first degree. According to the Court:

The instruction was generated by evidence, most of which was elicited through the defendant's witness, Dr. William Brownlee .... Dr. Brownlee testified that the wounds inflicted on Mrs. Bronstein were consistent with their having been made by a certain bent knife found under or next to her body. There was a nick on the blade of that knife. The witness also testified that the wounds to Mr. Bronstein were consistent with having been made by the same bent knife.... Dr. Brownlee said that the nick on that knife was caused by something metallic, possibly a knife.... He acknowledged that "[i]t would be a hypothesis" that the nick was caused by striking another knife "at the same time of the perpetration."

*Booth IV,* 608 A.2d at 183–84.

 To the extent that Booth–El relies on violations of state law, his claim is not cognizable in this court. *See Roach v. Angelone,* 176 F.3d 210, 215–17 (4th Cir. 1999). To the extent that his claim is based on a violation of federal constitutional rights, the assertion is without merit. Indeed, to constitute grounds for federal habeas corpus relief, a jury instruction must not merely be incorrect; rather, it must "violate[ ] some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Booth–El has identified no such right. The fact that the State did not pursue a joint principal theory did not preclude the trial judge from giving an instruction on that theory if he deemed it appropriate and supported by the evidence introduced at trial. *See United States v. Gray,* 47 F.3d 1359, 1369 (4th Cir.1995); *United States v. Horton,* 921 F.2d 540, 543–44 (4th Cir.1990).

---

supported by the Supreme Court's decision in *Carmell,* as that decision points out, the principle has its roots in the seventeenth century prosecution of Sir John Fenwick for treason. (529 U.S. at 526–30, 120 S.Ct. at 1629–31). Even *Collins,* which was decided two years before Booth–El's death sentence became final and relied on by the Maryland Court of Appeals, recognized the *Calder* categories. 497 U.S. at 46, 110 S.Ct. at 2721. Thus,

reasonable jurists in 1992 " 'would have felt compelled by existing precedent' to rule in his favor," and the *ex post facto* claim is not based upon a new rule of law. *Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 898, 122 L.Ed.2d 260 (1993) (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)). It is not necessary to address the two exceptions to non-retroactivity.

*Sufficiency of the Evidence—First–Degree Principal: Claim V*

Booth–El argues that the evidence presented during the 1990 re-sentencing was insufficient to support the jury's finding that he was a principal in the first degree.[24] In that proceeding, Jewell Booth testified: "I am not too sure, but I think [Booth–El] said Sweetsie killed the woman and he killed the man and then he went into this ridiculous statement about his grandmother." (State's Answer, Ex. 20 at 137.) She stated further that, when she asked Booth–El whether he killed the Bronsteins, he responded: "I am surprised you would ask me something like that. Of course not. Go to bed." (*Id.* at 138.) Booth–El contends that this testimony was too equivocal and uncertain to be believed beyond a reasonable doubt and cannot support a finding that he was a principal in the first degree.

The Court of Appeals disagreed. It noted Eddie Smith's testimony that, shortly after the murder, Reid said in the presence of Booth–El, "we [referring to Reid and Booth–El] or he [referring to Booth–El] just killed a couple mother fuckers" and Veronda Mazyck's statement that, after the murder, she asked why Petitioner and Reid had killed the Bronsteins and he responded "because they knew me and my nephew." *Booth IV*, 608 A.2d at 182. Circumstantial evidence further supports such a finding. As explained by the Court of Appeals:

There was evidence that the wound patterns on the two bodies were substantially different, which tended to show that two separate people did the killings. There was evidence showing that the Bronsteins knew and could identify Booth but not Reid, which suggested that Booth had the greater motivation for murdering the couple.

*Id.*

Courts review the sufficiency of the evidence necessary to prove the existence of an aggravating factor under the standard established by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Under the *Jackson* standard, a court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements ... beyond a reasonable doubt.'" *See Roach*, 176 F.3d at 218 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789). Considering both the testimonial and circumstantial evidence in this case in the light most favorable to the prosecution, a rational trier of fact could have so concluded. Accordingly, the court concludes there was sufficient evidence to find that Booth–El was a principal in the first degree.

*Denial of Life Without Parole Option: Claim VI*

Under Maryland law at the time the Bronsteins were killed, first-degree murder was punishable either by death or life imprisonment with the possibility of parole. Md. Ann.Code Art. 27, § 412(b)

**24.** Under Maryland law, accomplice testimony must be corroborated to sustain a conviction. *Turner v. State*, 294 Md. 640, 452 A.2d 416, 417 (1982). Booth–El argues that this rule should be applicable equally to prove first-degree principalship at a capital sentencing. As explained below, the prosecution has presented sufficient corroborating evidence to support its conviction. Moreover, "federal habeas corpus relief is unavailable where a petitioner alleges the state court incorrectly or inadequately applied state law." *Roach*, 176 F.3d at 216. Consequently, "absent some specific evidence that the review procedures employed by [the state] court constituted an independent violation of the federal constitution, [the federal court] shall not entertain [the petitioner's] contention that the state court failed to follow state law." *Id.* at 216 (citing *Fisher v. Angelone*, 163 F.3d 835, 854–55 (4th Cir.1998)). No such violation has occurred here.

(1957, 1978). Effective July 1, 1987, the statute was amended to provide for a third option—life imprisonment without the possibility of parole. *See* 1987 Md. Laws ch. 237; *Collins v. State,* 318 Md. 269, 568 A.2d 1, 15 (1990).

During the 1990 sentencing proceedings, Booth–El requested that the jury be allowed to consider a sentence of life without parole. (State's Answer, Ex. 39 at 38–44.) The motion was denied on the basis that such a sentence could not be imposed for an offense committed prior to July 1, 1987. (*Id.,* Ex. 13 at 125–26). Booth–El argues that depriving him of this option violates the Eighth and Fourteenth Amendments and the rule explained in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

In *Beck* the defendant was charged with robbery-intentional killing, a capital crime. He testified that he and an accomplice had entered the victim's home to rob him and that he grabbed the victim intending to tie him up. His accomplice, however, unexpectedly struck and killed the victim. Under Alabama law, this version of the events constituted felony murder, not a capital offense. Due to a prohibition on instructing a jury on lesser included offenses in capital cases, the jury was not instructed on felony murder. Instead, the jury was instructed that if the defendant was found not guilty of the capital offense of robbery-intentional killing, he would be released. The Supreme Court found a due process violation, holding:

> [O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason—that,

whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.

*Beck,* 447 U.S. at 642–43, 100 S.Ct. at 2392.

In *California v. Ramos,* the Supreme Court declined to extend its holding in *Beck* to sentencing proceedings. 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). The defendant in *Ramos* was convicted of first-degree murder, which was punishable by either death or life imprisonment without the possibility of parole. By statute, the judge was required to instruct the jury that the Governor had the authority to commute the sentence to one with the possibility of parole. *Id.* at 995, 103 S.Ct. at 3450.

The Court declined to extend its holding in *Beck* to invalidate this requirement for two reasons. First, it concluded that the instruction did not limit the jury to two sentencing choices, neither of which might be appropriate in a particular case. *Id.* at 1007, 103 S.Ct. at 3456–57. Second, it distinguished between guilt and sentencing proceedings.

> In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.

In this sense, the jury's choice between life and death must be individualized. "But the Constitution does not require the jury to ignore other possible ... factors in the process of selecting ... those defendants who will actually be sentenced to death." *Zant v. Stephens*, 462 U.S. [862, 878], 103 S.Ct. [2733,] 2743 [ (1983) ] (footnote omitted). As we have noted, the essential effect of the Briggs Instruction is to inject into the sentencing calculus a consideration akin to the aggravating factor of future dangerousness in the Texas scheme. See p. 3454 *supra.* This element "is simply one of the countless considerations weighed by the jury in seeking to judge the punishment appropriate to the individual defendant." [462 U.S. at 900], 103 S.Ct. at 2755 (Rehnquist, J. concurring in judgment).

*Id.* at 1008, 103 S.Ct. at 3457.

Booth–El argues that, although his claim arises out of a sentencing proceeding, it is governed by *Beck* because an issue of death eligibility, i.e., principalship, was decided during the sentencing proceedings. This argument was raised on direct appeal. The Maryland Court of Appeals found that, because principalship is an issue of sentencing and not guilt, Booth–El was not entitled to have the jury instructed on a life without parole option. *Booth IV*, 608 A.2d at 173–74.

Even if principalship is an element of the crime, *see, e.g., Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2364–65, 147 L.Ed.2d 435 (2000), none of the concerns voiced by the Supreme Court in *Beck* are present in the instant case. At the time the Bronsteins were murdered, life without parole was not a sentence available under Maryland law in any type of case. Thus, Booth–El cannot argue plausibly that he presented evidence which could have supported such a sentence, nor can he assert that its absence forced the jury to choose between two alternatives which might both be inappropriate. He was convicted of first-degree murder. The possible sentences at the time of the offense for that crime were death and life imprisonment with the possibility of parole.[25] Md.Code Ann. Art. 27, § 412(b) (1957). Those possibilities were presented to the jury.

### *Allen Charge: Claim VII*

■ At the time of the Bronsteins' murder, Md. Ann.Code Art. 27, § 413(k)(2) provided that "[i]f the jury, within a reasonable time, is not able to agree as to sentence, the court shall dismiss the jury and impose a sentence of imprisonment for life."[26] The sentencing jury began deliberations at 3:00 p.m. on August 15, 1990. (State's Answer, Ex. 24 at 145.) At 7:10 p.m., Judge Angeletti sent the jury home for the night. (*Id.* at 146.)

The jury resumed deliberations at 9:17 a.m. the next morning. (*Id.,* Ex. 25 at 14.) At approximately 2:25 p.m., they sent a note to Judge Angeletti which said, "We are split on Question 1, Section 1. We are unable to come to an agreement on that statement." (*Id.* at 15.) The part of the verdict form referred to in the note provided:

> Based upon the evidence, we unanimously find that each of the following state-

---

**25.** This Court is bound by the Fourth Circuit's determination that the 1987 amendments creating a sentence of life without parole are not retroactively applicable. *Hunt v. Nuth*, 57 F.3d 1327, 1335 (4th Cir.1995).

**26.** Effective July 1, 1987 this provision was amended to read: "If the jury, within a rea-

sonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death." 1987 Md. Laws ch. 237. This change was not applied at Booth–El's 1990 resentencing. *See Booth IV*, 608 A.2d at 166.

ments marked "proven" has been proven BEYOND A REASONABLE DOUBT and that each of those statements marked "not proven" has not been proven BEYOND A REASONABLE DOUBT.

1. The defendant was a principal in the first degree to the murder.

proven not
proven

(*Id.*, Ex. 39 at 173.) Booth–El promptly requested that the jury be dismissed and a life sentence imposed pursuant to § 413(k)(2). His request was denied. (*Id.*, Ex. 25 at 15–17.)

Judge Angeletti then instructed the jury:

> I am going to reread to you the charge on the law so that you are clear as to what your responsibilities are in that area.
>
> The law requires that in order for you to conclude beyond a reasonable doubt that the State has proven that Mr. Booth was a first degree principal in the murder of Mr. Bronstein, all of you must agree within a reasonable time, and your verdict must be unanimous.
>
> If any of you cannot conclude that the State had proven beyond a reasonable doubt that Mr. Booth is a principal in the murder of Mr. Bronstein, then you must mark "not proven" in the form and enter the words "life imprisonment" in Section 6.
>
> In arriving at your decision, you must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

Each of you must decide the case for yourself, but you must do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as the weight or effect of the evidence only because of opinions of your fellow jurors, or for the mere purpose of reaching a verdict.

(*Id.* at 17–18.)

The jury resumed deliberations at 2:45 p.m. At approximately 5:50 p.m., they asked to be excused for the day because two members were not feeling well. Booth–El again requested that the jury be discharged and a life sentence imposed. Judge Angeletti denied this request and sent the jury home for the night. (*Id.* at 19–20.)

The next morning Booth–El renewed his motion to have the jury discharged and a life sentence imposed and, again, it was denied. Jury deliberations resumed at 9:00 a.m. At 2:25 p.m., the jury announced that it had reached a verdict. (*Id.*, Ex. 26 at 3–4.)

Booth–El argues that Judge Angeletti's instruction was coercive and deprived him of a fair trial. On direct appeal, Booth–El argued that Judge Angeletti erred in giving an *Allen* charge when the jury reported that it was unable to agree on the principalship issue and that, instead, the judge should have imposed a life sentence under § 413(k)(2).[27] (*Id.*, Ex. 38 at 31–41.)

---

**27.** The Court of Appeals rejected the argument that Judge Angeletti should have dismissed the jury and imposed a life sentence. It held that "in Maryland, it is the court's function to determine whether the jury's total deliberations have extended beyond a reasonable time." *Booth IV*, 608 A.2d at 167. Further, it found that this decision was left to the discretion of the trial court. *Id.*, 608 A.2d at 169. To the extent Booth–El argues that, under Maryland law, he was entitled to have a life sentence imposed when the jury reported their inability to agree, his claim is not one on which federal habeas corpus relief can be granted. *Roach*, 176 F.3d at 216.

In *Allen v. United States,* the Supreme Court approved the use of a supplemental jury instruction directing the jury to return to deliberations and attempt to reach a verdict. 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). In so doing, the Court stated:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

164 U.S. at 501–502, 17 S.Ct. 154. In *Jenkins v. United States,* the Supreme Court reversed a conviction where the jury was instructed, after reporting that they were unable to reach a verdict, "You have got to reach a decision in this case." 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965). The Court found this instruction coercive. *Id.* It also reversed a conviction reached when, after a jury had deliberated for seven days and twice been given *Allen* charges, the judge had an *ex parte* meeting with the foreman and may have given him the impression that a ver-

dict "one way or the other" was required. *United States v. United States Gypsum Co.,* 438 U.S. 422, 461–62, 98 S.Ct. 2864, 2885–86, 57 L.Ed.2d 854 (1978).

All of those cases involved federal criminal charges and were decided without reliance upon constitutional grounds. In *Lowenfield v. Phelps,* however, the Court examined an *Allen* charge given to a state jury during sentencing proceedings in a capital case on constitutional grounds and concluded that it was not coercive. 484 U.S. 231, 241, 108 S.Ct. 546, 552, 98 L.Ed.2d 568 (1988). While the Court noted that the cost of a retrial was not a concern because state law called for the imposition of a life sentence if the jury was unable to agree, it also explained that "[t]he State has in a capital sentencing proceeding a strong interest in having the jury 'express the conscience of the community on the ultimate question of life or death.'" *Id.* at 238, 108 S.Ct. at 551 (quoting *Witherspoon,* 391 U.S. at 519, 88 S.Ct. at 1775). In concluding that the charge was not coercive, the Court looked at the language of the charge, the fact that the judge did not know the numerical division of the jury, and the fact that counsel did not object. *Id.* at 237–40, 108 S.Ct. at 550–52.

In rejecting Booth–El's claim that the *Allen* charge given to the sentencing jury in his case was unconstitutional, the Court of Appeals examined the instruction in *Lowenfield* and found that Judge Angeletti's instruction was substantially similar.[28]

---

**28.** The instruction approved in *Lowenfield* read:

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> Each of you must decide the case for yourself but only after discussion and impartial

consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. 484 U.S. at 235, 108 S.Ct. at 549.

*Booth IV,* 608 A.2d at 169–70. It noted that an *Allen* charge is not coercive merely because it is given in a capital sentencing proceeding. *Id.* at 170, 99 S.Ct. 2213.

Most of the traditional indicia of coercion are not present in this case.[29] Judge Angeletti did not know the numerical division of the jury. *See Brasfield v. United States,* 272 U.S. 448, 449–50, 47 S.Ct. 135, 135–36, 71 L.Ed. 345 (1926) (finding that questioning by judge as to numerical division of jury was improper). The charge was not specifically directed at the jurors in the minority.[30] Nor did the jury return within a short time after being given the *Allen* charge. *See Gypsum Co.,* 438 U.S. at 462, 98 S.Ct. at 2886 (verdict reached on the morning after the judge's *ex parte* conversation with foreman gives rise to "serious questions"); *United States v. Cropp,* 127 F.3d 354, 360 (4th Cir.1997) (finding fact that jury deliberated seven hours after *Allen* charge showed lack of coercion), *cert. denied,* 522 U.S. 1098, 118 S.Ct. 898, 139 L.Ed.2d 883 (1998). The total amount of time spent deliberating in this case, slightly less than eighteen hours over three days after seven days of evidence, does not indicate coercion. *See United States v. Glauning,* 211 F.3d 1085, 1087 (8th Cir.2000) (sixteen to eighteen hours deliberation after two day trial, standing alone, did not show coercion); *United States v. Frost,* 125 F.3d 346, 376 (6th Cir.1997) (three days of deliberation

after month long trial not significant), *cert. denied* 525 U.S. 810, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998). More importantly, Judge Angeletti did not, as Booth–El argues, advise the jury that a unanimous verdict was required. Rather, he instructed them that, while a finding that Booth–El was a first-degree principal must be unanimous, if "any" member of the jury did not agree with this conclusion the jury "must mark 'not proven' on the form and enter the words 'life imprisonment' " in the section for the sentence.[31] (State's Answer, Ex. 25 at 18.)

The Court of Appeals applied the proper legal standard to Booth–El's claim. *See Booth IV,* 608 A.2d at 169–70 (applying the *Lowenfield* standard). Its conclusion that the *Allen* charge was not coercive is not an unreasonable application of clearly established federal law. *See Tucker,* 221 F.3d at 614.

### Admission of Veronda Mazyck's Prior Testimony: Claim VIII

Veronda Mazyck testified at the 1984 trial to the events that took place on the night of the murders. She stated that, in 1983, she lived with Willie Reid on North Asquith Street. On the night of May 18, 1983, Reid and Booth–El came to the apartment with a small brown paper bag containing jewelry. She, Booth–El, Reid, and Jewell Edwards took a cab to Booth–El's home, where Booth–El got

29. In determining coerciveness of an *Allen* charge, the court considers the instruction, its context, any suggestion the jury would be forced to deliberate until a verdict is reached, suggestions that unanimity is required, whether the judge knew the numerical division of the jury, whether the charge was directed at the minority, the length of deliberations following the charge, the total length of deliberations, and whether the jury requested further instructions. *Tucker v. Catoe,* 221 F.3d 600, 611 (4th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 661, 148 L.Ed.2d 563 (2000).

30. Although the law in this Circuit states that an *Allen* charge should "incorporate a specific reminder both to jurors in the minority and those in the majority that they reconsider their positions in light of the other side's views," *United States v. Burgos,* 55 F.3d 933, 941 (4th Cir.1995), the rule is not one of constitutional law.

31. The Court of Appeals found this statement to be an erroneous characterization of Maryland law, but concluded that it was harmless error because it was not prejudicial to Booth–El. *Booth IV,* 608 A.2d at 169 n. 5.

some trash bags and gloves. They then went to a nearby house and entered through the back door. Inside she saw a woman lying on the floor with her hands tied behind her back and a man sitting on the couch with something covering his face. They removed appliances and other items from the house, placed them in a car which had been in the driveway, and took them to Ms. Mazyck's apartment. The next morning Ms. Mazyck asked Booth–El, "why you all do that to those people?" She testified that he replied, "because they knew me and my nephew." (State's Answer, Ex. 7 at 98–144.)

In 1986 a warrant was issued for Ms. Mazyck's arrest for violation of probation.[32] On June 6, 1989, she was arrested in Baltimore City on a new charge of burglary. Although she gave an alias, police or jail staff apparently were able to identify her. (*Id.*, Ex. 21 at 116–17.) On June 15, 1989, the Court of Appeals vacated Booth–El's 1988 sentence. On July 3, 1989, the Department of Parole and Probation became aware of Ms. Mazyck's arrest. On July 11, 1989, her probation officer became aware that she was scheduled for trial that day in Wabash District Court. He contacted the Baltimore City Sheriff's Department and was told that a detainer would be placed on Ms. Mazyck. Nevertheless, when Ms. Mazyck appeared for trial, the new charge was stetted and she was released. (*Id.* at 148.)

At the 1990 sentencing proceedings, the prosecution requested permission to read Ms. Mazyck's 1984 testimony into the record. A hearing was held outside the presence of the jury to determine whether she was available to testify. At that hearing, Detective Donald Steinheice of the Baltimore City Police Department homicide

unit testified he had attempted to locate Ms. Mazyck but was unable to do so. (*Id.* at 79–104.) An investigator for Booth–El testified she had been able to locate Ms. Mazyck and spoke with her on April 18, 1990. (*Id.* at 110.)

Judge Angeletti ruled that Ms. Mazyck was "unavailable" and allowed her 1984 testimony to be read into the record. (*Id.* at 183–84, 211–81; Ex. 21a at 8–59.) Sentencing counsel properly preserved his objections to the testimony. (*Id.*, Ex. 21 at 211.) The issue, however, was not raised on direct appeal. (*Id.*, Ex. 38.)

In his post-conviction petition, Booth–El argued that his appellate sentencing counsel was ineffective for failing to raise the issue of Ms. Mazyck's availability on direct appeal. (*Id.*, Ex. 46 at 90–98.) He also asserted that the state had failed to make a good faith effort to locate Ms. Mazyck. (*Id.* at 120–22.) Judge Friedman noted that the state had made substantial efforts to locate Ms. Mazyck for the sentencing proceedings. (*Id.*, Ex. 52 at 37.) She also noted that Booth–El did not produce Ms. Mazyck at the post-conviction hearing to testify about either her availability or his proffer that she had recanted her trial testimony. (*Id.*) Judge Friedman concluded that appellate counsel was not ineffective for failing to raise this issue. (*Id.* at 37–38.) She also found that the state had made a good faith effort to locate Ms. Mazyck, and she affirmed Judge Angeletti's ruling that Ms. Mazyck was unavailable. (*Id.* at 55–56.) Booth–El did not raise either issue in his application for leave to appeal the denial of post-conviction relief. (*Id.*, Ex. 53.)

In his motion to reopen the post-conviction proceedings, Booth–El argued that Judge Angeletti erred in ruling that Ms.

---

**32.** Ms. Mazyck pled guilty to being an accessory after the fact to murder for her role in the Bronsteins' murders. As part of the plea agreement, she was sentenced to 15 years, all of which was suspended, and she was required to testify against Booth–El. (State's Answer, Ex. 21a at 60–66.)

Mazyck was unavailable and that his appellate sentencing counsel was ineffective for not raising the issue on direct appeal. He further contended that his post-conviction counsel[33] was deficient in not calling Ms. Mazyck, not presenting other evidence at the post-conviction hearing, and not presenting a more thorough argument. (*Id.*, Ex. 62 at 25–45.) Judge Friedman concluded that it would not be in the interests of justice to allow Booth–El to reopen the post-conviction proceedings to raise these issues. She found that he had waived his proffer of Ms. Mazyck's testimony that she had been available in 1990 by the failure to present her testimony at the post-conviction hearing. As to his claim that post-conviction counsel had not presented additional legal authority, she concluded, "this court stands by its determination and application of the standard governing the availability of witnesses, specifically, Ms. Mazyck." (*Id.*, Ex. 69 at 19.)

In his application for leave to appeal the denial of his motion to reopen, Booth–El asserted that Judge Friedman had improperly interpreted the "interests of justice" standard in denying his motion. He also argued ineffective assistance of post-conviction counsel. (*Id.*, Ex. 71 at 15–21.) The Court of Appeals vacated Judge Friedman's decision with regard to the *Brady* issue but affirmed in all other respects. *Booth v. State,* 346 Md. 246, 696 A.2d 440 (1997).

In the present petition, Booth–El argues both that his right to confront witnesses was denied and that his appellate counsel was ineffective for failing to raise that issue on direct appeal. These claims were procedurally defaulted when they were not raised in the application for leave to appeal the denial of post-conviction relief. Raising the issues in the motion to reopen the post-conviction proceedings did not cure the default because Judge Friedman applied Maryland waiver principles and did not address them on the merits.[34] *See, e.g., Baker,* 220 F.3d at 290 n. 13.

Further, because there is no constitutional right to counsel in post-conviction proceedings, a claim of ineffective assistance of post-conviction counsel cannot serve as cause to excuse a procedural default. *Coleman,* 501 U.S. at 752–53, 111 S.Ct. at 2566; *Mackall,* 131 F.3d at 449. Thus, Booth–El has failed to show cause for the procedural default of these claims

### Failure of Trial Judge to Recuse Himself Due to Personal Knowledge Concerning Ms. Mazyck: Claim IX

During the hearing to determine if Ms. Mazyck was available to testify at the 1990 sentencing proceedings, Jennifer Clouse, an investigator for Booth–El, testified that she had spoken to Ms. Mazyck about her 1989 incarceration. She testified:

> Ms. Mazyck said that after she had been at the jail for about two weeks, she figured that she was going to do her time on the accessory after the fact charge, and she said that she called Judge Angeletti's chambers and she spoke to a man who identified himself as Judge Angeletti. She told him who she was, using her true name, and she said that she was over at the Baltimore City Jail. The man on the phone identified himself to her as Judge Angeletti and said, "Ronnie, we have been trying to find you for a long time." The conversa-

---

**33.** Booth–El was represented by Roger Galvin in the original post-conviction proceedings and on the application for leave to appeal. The motion to reopen was filed on his behalf by Nevett Steele and Michael Gentile, who were also the original counsel on the instant petition.

**34.** Respondents argue that a motion to reopen post-conviction proceedings can never revive a procedurally defaulted claim. This argument recently was rejected by the Fourth Circuit. *See Baker,* 220 F.3d at 291.

tion went on for a few more sentences, and the man that Ms. Mazyck believed to be the judge then said, "This is improper; we shouldn't be having this conversation," and the conversation was terminated.

(State's Answer, Ex. 21 at 113–14.)

Robert Thumma, Ms. Mazyck's probation officer, testified that on July 24, 1989, his office received a letter from Judge Angeletti concerning a letter that Ms. Mazyck had sent to the judge. (*Id.* at 150.) The record does not indicate the contents of either letter.

Counsel for Booth–El argued he should be allowed to determine if Ms. Mazyck had, in fact, spoken to Judge Angeletti and asked to examine her original letter. (*Id.* at 162–63.) Judge Angeletti denied any impropriety but did not otherwise respond. (*Id.* at 164.) Counsel then renewed the motion for recusal and asked for a mistrial. Alternatively, counsel asked that Ms. Mazyck's availability be determined by another judge. All of the requests were denied. (*Id.* at 164.)

The issue of *ex parte* contact between Judge Angeletti and Ms. Mazyck was not raised on direct appeal.[35] In his post-conviction petition, Booth–El contended that his appellate sentencing counsel was ineffective for failing to raise the argument that Judge Angeletti should have recused himself based upon his contact with Ms. Mazyck. His argument was based primarily on the Maryland Canons of Judicial Conduct. (*Id.*, Ex. 46 at 104–108.)

The post-conviction court found that the conversation and letter were "unproven and therefore ... not considered by the court." (*Id.*, Ex. 52 at 42.) Judge Friedman examined the other grounds that Booth–El argued should have been raised on appeal and concluded:

Thus, even if appellate counsel had raised these points on appeal in addition to the others that were raised, petitioner would not have prevailed. Also, it is quite possible that counsel strategically chose to raise the issues that were raised and not to raise others that would only muddy the waters. Thus, counsel's strategic choice could not be labeled as ineffective counseling.

(*Id.* at 43–44.)

In his application for leave to appeal, Booth–El did not challenge Judge Friedman's finding that the contacts with Ms. Mazyck were unproven. He did argue that his sentencing counsel was ineffective for failing to raise the issue of Judge Angeletti's recusal in a thorough manner, but he did not mention the contact with Ms. Mazyck. Rather, he argued Judge Angeletti "behaved as a prosecutor rather than as a neutral arbiter in his actions toward Eddie Smith, Veronda Mazyck and Jennifer Clouse." (*Id.*, Ex. 53 at 63.)

In his motion to reopen the post-conviction proceedings, Booth–El argued that he was denied due process and a fair trial when Judge Angeletti refused to recuse himself based upon his personal knowledge of Ms. Mazyck's availability from the phone call and letter. (*Id.*, Ex. 62 at 46–48). In denying the motion to reopen, Judge Friedman stated that, because the issue should have been raised on direct appeal, Booth–El had to overcome the presumption that it was waived. She then stated that since the arguments about the phone call and letter had been rejected as unproven in the original post-conviction proceedings, they would not be reconsidered. (*Id.*, Ex. 69 at 21.)

In the present petition, Booth–El asserts that he was denied due process and a

---

**35.** Booth–El did argue that Judge Angeletti erred in not recusing himself, but did so on grounds other than contact with Ms. Mazyck. (State's Answer, Ex. 38 at 130–33.)

fair trial because Judge Angeletti refused to recuse himself despite his *ex parte* contacts with Ms. Mazyck. His failure to raise this claim on direct appeal constitutes a procedural default. The default was not cured by the motion to reopen post-conviction proceedings because Judge Friedman found that the claim had been waived by the failure to raise it on direct appeal. *See Oken v. Corcoran,* 220 F.3d 259, 264–65 (4th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1126, 148 L.Ed.2d 992 (2001).

 While ineffective assistance of appellate counsel may, under some circumstances, be cause for a procedural default, Booth–El's claim for ineffective assistance of appellate sentencing counsel itself is procedurally defaulted by the failure to raise it with any degree of specificity in the application for leave to appeal the denial of post-conviction relief. Thus, the claim may serve as cause only if Booth–El can show cause and prejudice for this second level of procedural default. *Edwards,* 529 U.S. at 453–54, 120 S.Ct. at 1592.

The only "cause" asserted by Booth–El is deficient performance by post-conviction counsel. As is discussed *supra,* ineffective assistance of post-conviction counsel cannot serve as cause for a procedural default.

### Use of Robbery to Sustain Felony Murder Conviction and as Sole Aggravating Factor: Claim X

 Booth–El argues that, in cases such as this one, where a robbery renders the defendant eligible for the death penalty, it is unconstitutional also to use the robbery as the sole aggravating factor because it does not "narrow" the class of death eligible defendants. This claim was not raised at any point in the state proceedings. Although Booth–El now asserts that the failure to "preserve" this issue was due to ineffective assistance of counsel, that claim also was never presented to the state courts. It, therefore, cannot serve as cause. *Oken,* 220 F.3d at 265 (citing *Edwards,* 529 U.S. at 453, 120 S.Ct. at 1592).[36]

### Conduct of Judge Angeletti at Sentencing: Claim XI

Booth–El argues that Judge Angeletti's conduct during the 1990 sentencing proceeding violated his right to a fair trial. First, he asserts that the Maryland Code of Judicial Conduct required Judge Angeletti to recuse himself.[37] Because it is a matter of state law, this claim cannot provide grounds for federal habeas corpus relief. *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir.1998).

Next, Booth–El contends that Judge Angeletti was biased against him in fact and appearance. In support of this argument Booth–El relies upon the following incidents: 1) during a meeting with counsel prior to the 1990 sentencing hearing Judge Angeletti referred to Booth–El as "amoral"; 2) Judge Angeletti offered to consider recusing himself if Booth–El would waive his right to a jury and agree to be sen-

---

**36.** Even if this claim were not procedurally defaulted, it is without merit. *See Lowenfield,* 484 U.S. at 244–46, 108 S.Ct. at 554–55 (1988) (finding no constitutional violation where the narrowing function performed at both the guilt-innocence and sentencing phases used the used an element of the crime as the sole aggravating factor).

**37.** Canon C of the Code of Judicial Conduct, currently codified as part of Md. Rule 16–813, provides in relevant part:

RECUSAL. (1) A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

tenced by another judge chosen by Judge Angeletti; 3) Judge Angeletti stated that he intended to rule upon pending motions as he had in the past; 4) Judge Angeletti's questioning of a defense expert, Dr. William Brownlee, was prosecutorial in nature; and 5) Judge Angeletti's treatment of defense witness Jennifer Clouse was prosecutorial in nature. Booth–El also asserts that, having been reversed twice in this case, Judge Angeletti had a personal stake in the outcome of the proceedings. Finally, Booth–El argues that, because Judge Angeletti had twice completed a Report of Trial Judge as required by Md. Rule 4–343,[38] he was a trier of fact and could not serve as a judge.

On direct appeal, Booth–El argued that Judge Angeletti should have recused himself as a result of his pre-sentencing proceeding comments that Booth–El was amoral and that he would rule upon pending motions as he had before, and because he had a personal stake in the outcome having been reversed twice in this case. Booth–El based his argument upon Canon 3 of the Code of Judicial Conduct, not any constitutional provision. (State's Answer, Ex. 38 at 130–133.)

In his post-conviction petition, Booth–El argued that his appellate sentencing counsel was ineffective for failing to fully argue the recusal issue. Specifically, Booth–El asserted that the appellate counsel should have argued that: 1) Judge Angeletti's conduct was prosecutorial in nature when he: (a) consistently overruled objections to the testimony of Eddie Smith, (b) questioned Dr. Brownlee, and (c) questioned Ms. Clouse; 2) Canon 3 of the Maryland Code of Judicial Conduct required recusal because Judge Angeletti had participated in *ex parte* communications with Ms. Ma-

zyck and had presided over proceedings involving a member of her family; 3) Judge Angeletti improperly referred to Booth–El as "Mr. Guilt"; and 4) Maryland law required that a different judge rule on the recusal motion. Once again, Booth–El based his underlying recusal arguments solely on Maryland law. (*Id.*, Ex. 46 at 99–109; Ex. 50 at 11–13.)

In his motion to reopen the post-conviction proceedings, Booth–El argued for the first time that Judge Angeletti's conduct during the 1990 sentencing proceedings violated his constitutional right to a fair trial. In that motion, he presented essentially the same arguments as are raised in the instant petition. (*Id.*, Ex. 62 at 48–72.) In denying the motion to reopen Judge Friedman addressed these claims as follows:

> Petitioner's recusal claims, when reviewed as direct constitutional claims, are absolutely barred by the failure to present them on direct appeal and reopening is, thus, not in the interests of justice. Art. 27, § 645A; *McElroy v. State*, 329 Md. 136, 138–42, 617 A.2d 1068 (1993). Further, even if the recusal grounds were not barred under the waiver provisions in § 645A, the fact that the grounds advanced were fully available to the petitioner at the time of the initial post conviction proceeding shows that reopening is not in the interests of justice.

(*Id.*, Ex. 69 at 23.) Given this clear invocation of a procedural bar by the state court, Booth–El defaulted his constitutional claims by failing to raise them on direct appeal.

To the extent that he is attempting to assert ineffective assistance of appellate sentencing counsel as cause, that claim is

---

**38.** This Rule requires the presiding judge to prepare a report after sentencing with basic factual information about the defendant, the offense, the trial, and sentencing. One sec-

tion calls for the judge's recommendation about whether imposition of the death sentence is justified.

defaulted by the failure to present any type of underlying constitutional argument in his original post-conviction claim for ineffective assistance.

**Maryland's Failure to Provide for Automatic Review of Ineffective Assistance of Counsel Claims is Unconstitutional: Claim XII**

 Under Maryland law, ineffective assistance of counsel claims generally are required to be raised in post-conviction proceedings, not on direct appeal. *Colvin v. State*, 299 Md. 88, 472 A.2d 953, 965 (1984). There is, however, no right of appeal in post-conviction proceedings. Appellate review must be sought by filing an application for leave to appeal. Md. Ann. Code Art. 27, § 645–I. Booth–El asserts that this system violates the Eighth and Fourteenth Amendments. Identical arguments were rejected by the United States Court of Appeals for the Fourth Circuit in *Hunt*, 57 F.3d at 1336–37. Booth–El makes no effort to distinguish that decision nor explain why it is incorrect.

**Delay in Execution: Claim XIII**

 Booth–El argues that executing him seventeen years after his conviction would constitute cruel and unusual punishment. This claim was raised for the first time in his motion to reopen the post-conviction proceedings. (State's Answer, Ex. 62 at 72–75.) Contrary to Respondents' assertions, a claim may be exhausted by being raised through a request to reopen post-conviction proceedings. *Baker*, 220 F.3d at 291. Indeed, with a claim of this nature, the first opportunity to present it may be a motion to reopen.

 In her opinion denying the motion to reopen, Judge Friedman agreed with the state's argument that, because the delay was due to Booth–El's legal attacks on his conviction and sentence, it would not be in the interests of justice to reopen the proceedings to consider this claim.

(State's Answer, Ex. 69 at 24–25.) Booth–El did not challenge this decision in his application for leave to appeal. (*Id.*, Ex. 71.) Thus, his claim was procedurally defaulted. *See Bradley*, 551 F.Supp. at 481 (failure to seek leave to appeal denial of post-conviction relief). Booth–El makes no attempt to show cause and prejudice for this default. Where a petitioner "does not attempt to establish cause and prejudice or actual innocence to excuse his default, we do not consider whether either exists." *Fitzgerald v. Greene*, 150 F.3d 357, 367 (4th Cir.), *cert. denied*, 525 U.S. 956, 119 S.Ct. 389, 142 L.Ed.2d 321 (1998).

**Ineffective Assistance of Counsel: Claims XIV–XVII**

To state a claim for ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–94, 104 S.Ct. at 2064–68. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Whitley v. Bair*, 802 F.2d 1487, 1493 (4th Cir.1986). This standard was applied by the post-conviction court. (State's Answer, Ex. 52 at 7–8.)

In the instant petition Booth–El presents several claims for ineffective assistance of counsel. Those claims are analyzed in the following sections.

**A. Guilt/Innocence Counsel**

**1. Failure to investigate/present forensic evidence relating to the "two knife theory"**

 There were two knives recovered from the Bronsteins' home; a bent knife with blood on it was found under Mrs. Bronstein's body, and a serrated knife with

no blood was found on a chair. (*Id.*, Ex. 7 at 9–10). At trial, the prosecution argued that Booth–El killed Mr. Bronstein and Reid killed Mrs. Bronstein.[39] (*Id.*, Ex. 10 at 41–42.) Although the prosecution argued that differences in Mr. and Mrs. Bronstein's wounds showed that they had been killed by different persons, it never specified whether more than one knife was involved. (*Id.* at 48.) Booth–El's trial counsel did not challenge the theory that each of the Bronsteins had been killed by a different person. Instead, counsel argued that the State had not met its burden of proof for either premeditated or felony murder. (*Id.* at 53–61.)[40]

During the 1990 re-sentencing proceedings, Booth–El called Dr. William Brownlee as an expert witness. Dr. Brownlee testified that both Mr. and Mrs. Bronstein's wounds appeared to have been inflicted by a single-edged knife with a heel. (*Id.*, Ex. 21a at 109–11.) He opined that the serrated knife found at the scene was not used in either killing and that the bent knife could have been used in both. (*Id.* at 112–15.) During Dr. Brownlee's testimony, it was brought out that the blood on the bent knife had not been tested to determine the blood type. (*Id.* at 115–16.) The sentencing jury nevertheless concluded that Booth–El was a principal in the first degree of Mr. Bronstein's murder.

The post-conviction court concluded that, in his claims for ineffective assistance of counsel, Booth–El had not met the second prong of the *Strickland* test. It reasoned that, since the sentencing jury had the benefit of Dr. Brownlee's testimony and still concluded beyond a reasonable doubt that Booth–El was a principal in the first degree, the testimony would not have made any difference in the verdict had it been presented during the guilt/innocence phase. (State's Answer, Ex. 52 at 10–11.) This conclusion is not an unreasonable application of clearly established federal law. *See Williams*, 529 U.S. at 391, 120 S.Ct. at 1512 ("[A] reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different ... is a probability sufficient to undermine confidence in the outcome.") (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

### 2. Failure to properly object to jury pool

The pool from which jurors for the 1984 guilt/innocence trial were chosen included three panels. Booth–El argues that the second panel was "tainted" and that counsel failed to preserve this issue for appeal.

In support of his argument that the panel was tainted, Booth–El relies on voir dire statements: a) by two panel members that they overheard conversations in the jury room about the case; b) by two different panel members in which they expressed fear; c) by three panel members refusing to provide their addresses; and d) by another juror stating that he believed Booth–El was guilty.[41] Although Ms. Shearer expressed concern over the panel,[42] she specifically stated that she was not

---

**39.** The jury was instructed on both premeditated and felony first-degree murder for each of the Bronsteins. (State's Answer, Ex. 10 at 72.)

**40.** Booth–El was represented by Roger W. Brown and Donna P. Shearer at the 1984 trial.

**41.** According to Booth–El, William Pascoe and Douglas Freeman were the panel members who heard others discussing the case, Amelia Matthews and Virginia Anderson expressed fear, Mr. Freeman, Mary Fletcher and Kathy Roseborough refused to give their addresses, and Ronald Markhum stated that "my opinion is that the Defendant was guilty." (Petition at 118–23.)

**42.** The following exchange occurred between defense counsel and Judge Angeletti after Mr. Pascoe's voir dire:

challenging the entire array. (State's Answer, Ex. 5 at 183.) At the post-conviction hearing, lead defense counsel, Mr. Brown, was questioned regarding the concerns about the panel. He testified:

C. That I—I read that in there and that leads me to believe that it was, you know, one of the things you'd throw up during the course of the trial and if you can get something out of it you can, if not, then, you know—I don't get the impression in looking at that that it was something that—that we really wanted to—to fight on that level about. . . .

. . . . .

D. If it was meritorious we would have wanted to raise it. I mean, and preserve it for appeal. But I'm not sure it was meritorious in looking at it. I just don't know. I mean, I think that if—if we had really felt strongly about it, then I think we would have preserved it.

(*Id.*, Ex. 28 at 53.)

In her post-conviction opinion, Judge Friedman noted that all of the jurors ultimately chosen had stated that they could be impartial. She concluded that counsel

> Ms. Shearer: I am also concerned about this panel as a whole. Apparently there is a rumor going around that he was found guilty and the case was overturned due to an exclamation point [sic], and *that they are not following your honor's* instructions not to discuss the case, and that there has been some opinion formed within the jury assembly room this morning.
> The Court: Keeping that in mind, the court will inquire of each panelist whether or not they have heard anything about the case, what they have heard, and whether or not that would [influence] their opinion and if it would the court will not keep them, and if it would not we will continue with the remaining questions.

(State's Answer, Ex. 4 at 43.) Counsel later reiterated her concerns. (*Id.*, Ex. 5 at 181–83.)

had made a tactical decision to preserve the jury that had been chosen. (*Id.*, Ex. 52 at 19–20.) She also found that, in light of the fact that none of the members of the second panel who had expressed fear or reported conversations ultimately were chosen to sit on the jury, an appellate court would not have found the jury to have been tainted even if the issue had been preserved for appeal. (*Id.* at 20.) This conclusion is not an unreasonable application of clearly established federal law. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).[43]

**3. Failure to request removal of a juror, Gail Graves, who expressed "fear"**

After opening statements, Judge Angeletti received a note from one of the jurors asking to speak with him. He called her,

**43.** In *Murphy,* the Supreme Court held:

> The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. [717], 722, 81 S.Ct. [1639], 1642 [1961]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S.Ct. at 1642.

421 U.S. at 799–800, 95 S.Ct. at 2036.

counsel, and Booth–El to the bench and had the following exchange:

> Ms. Graves: Okay. In the vicinity where I work, I work near Park Heights and Pimlico. I work right on the corner where all this took place. I didn't even know I was going to be selected, but just that I am now. I am just—I am really scared. I am frightened for my family and things like that since I work in the vicinity. I work for a public place, for a bank. You were saying all the witnesses that lived in the area were going to be testifying. I don't know if they are going to be testifying against him or for their side, but either way—

> The Court: Ms. Graves, there is no cause for fear in this matter. This is a normal reaction and emotion that a person as a juror would normally have. You were selected as a juror. I will simply ask you to throw out of your mind any of these considerations. Simply listen to the evidence. There is absolutely no cause of concern or fear in this case.

(State's Answer, Ex. 6 at 53–54.) Counsel did not move to strike Ms. Graves and did not ask that any further inquiry be made.

At the post-conviction hearing, Mr. Brown testified that defense counsel had considered whether to request that Ms. Graves be stricken, but had decided not to because they believed she could "be fair, could maybe hold out, if not for—on guilt or innocence at least on the second phase of the trial." (*Id.*, Ex. 28 at 56–57.) Judge Friedman found to be speculative Booth–El's argument that, if Ms. Graves had been stricken, she would have been replaced with an impartial alternate who could have swayed the jury. She concluded that, in light of Mr. Brown's reasons for wanting Ms. Graves to remain on the jury,

there was no error in not moving to strike. (*Id.*, Ex. 52 at 20–21.) This court agrees that counsel made a reasoned, tactical decision in not moving to strike Ms. Graves. This type of tactical decision should not be "second-guessed on collateral review." *Fitzgerald v. Thompson,* 943 F.2d 463, 469 (4th Cir.1991).

**4. Trial counsel failed to preserve voir dire objections**

After the jury had been chosen, defense counsel stated:

> Very briefly, Your Honor. At the conclusion of your selection this morning, there was one thing which we neglected to put on the record. I would like the Court's permission to do that at this time; that is, simply the Court's jury is acceptable to the defense subject to the previous objections that have been made with regard to the *Witherspoon* matter, and bifurcation.

(State's Answer, Ex. 6 at 55.) Booth–El argues that this statement was ineffective because it did not preserve for appeal any objections other than the two mentioned. The only specific objection that Booth–El complains was waived is the objection to Mr. Pascoe.

Judge Friedman found that Booth–El was not prejudiced by the failure to preserve this objection because Mr. Pascoe did not serve on the jury; he was stricken by the prosecution. Thus, she concluded Booth–El did not meet the second prong of the *Strickland* test. (*Id.*, Ex. 52 at 23.) This conclusion is a proper application of clearly established federal law.

**5. Collectively, the errors of trial counsel prejudiced the fair outcome of the trial**

Ineffective assistance of counsel claims "must be reviewed individually, rather than collectively." *Fisher,* 163 F.3d at 852. Because, individually, none of the alleged

errors amounted to unconstitutionally ineffective assistance of counsel, their cumulative effect cannot constitute ineffective assistance.

### B. 1984 Appellate Counsel

#### 1. Failure to order a complete transcript of the voir dire proceedings

 On direct appeal, Booth–El was represented by George Burns and Julia Doyle Bernhardt from the Office of the Public Defender. Only portions of the voir dire were transcribed for that appeal. (*See* State's Answer, Ex. 2–4.) At the post-conviction hearing, Mr. Burns testified that, in 1984, the Public Defender's Office policy was not to order an entire transcript of voir dire but that "anything that was objected to, that is anything there was a reasonable probability that could be raised on appeal was ordered." (*Id.*, Ex. 28 at 5–6.)

Booth–El argues: a) the failure to order a complete transcript constitutes ineffective assistance even without an allegation of prejudice because his appellate counsel was different from his trial counsel; b) he was prejudiced by the failure to order a complete transcript because his appellate counsel was precluded from arguing that the State had exercised its peremptory challenges in a racially biased manner; and c) he was prejudiced by the failure to order a complete transcript because the transcript would have shown contamination of the second jury panel. (Petition at 131–37.)

In addressing this claim, Judge Friedman noted that there was no Maryland or Supreme Court decision concluding that counsel's failure to obtain a complete transcript constitutes *per se* ineffective assistance. She then stated:

> [I]n testimony at post conviction, appellate counsel indicated that they followed their standard and established procedure in the ordering of the transcript.

> Appellate counsel consulted with trial counsel and ordered those portions of the transcript where issues were raised. Appellate counsel was not ineffective in this case.

(State's Answer, Ex. 52 at 25–26.)

As Judge Friedman noted, the Supreme Court has never found that failure to order a complete trial transcript is *per se* ineffective. Further, those federal courts of appeal that have addressed the issue have concluded that a defendant arguing ineffective assistance of counsel in this context must demonstrate prejudice. *See Goodwin v. Johnson*, 132 F.3d 162, 176 n. 10 (5th Cir.1997); *Glover v. Littlefield*, 30 F.3d 133, 1994 WL 315228 at *2 (6th Cir. June 29, 1994) (unpublished); *Gruszie v. United States*, 937 F.2d 612, 1991 WL 127709 at *1 (9th Cir. July 15, 1991) (unpublished). Thus, Judge Friedman's conclusion that counsel was not *per se* ineffective in failing to obtain a complete voir dire transcript was not contrary to clearly established federal law.

Judge Friedman also noted that Booth–El had produced no evidence to support his claim that the prosecution had exercised its peremptory strikes in a racially discriminatory manner. She reiterated her earlier conclusion that the second jury panel "was not so contaminated as to prevent the petitioner from having an impartial jury." She also noted appellate counsel's testimony that standard procedures were used in deciding what portions of the transcript to order. She concluded it was not ineffective assistance for counsel not to order the complete transcript. (State's Answer, Ex. 52 at 25–26.) Her determination is not an incorrect application of clearly established federal law.

#### 2. Failure to raise "bias" of the second jury panel on appeal

Booth–El argues that it was ineffective for his appellate counsel not to raise the

bias of the second jury panel on appeal. Judge Friedman restated her earlier conclusion that the appellate court would not have found the jury tainted and that, therefore, it was not ineffective assistance for counsel to fail to raise this issue. (*Id.* at 26.) As Booth–El does not meet the second prong of the *Strickland* test, Judge Friedman's conclusion was not an unreasonable application of clearly established federal law.

### 3. Failure to raise on appeal "false" answers given by members of the second jury panel during voir dire

Booth–El argues that members of the second jury panel concealed the fact that they had participated in conversations about the case. Judge Friedman concluded that this claim was "redundant" of his claim for failure to raise the bias issue. (*Id.* at 26.) Whether this is a separate claim or merely a variation on the bias claim, it fails in light of Judge Friedman's determination that the chosen jury was not tainted.

### C. 1990 Sentencing Counsel

### 1. Sentencing counsel failed to preserve voir dire objections.

At his 1990 re-sentencing, Booth–El was represented by Thomas Hill and Gadi Weinreich of the Washington, D.C. firm, Shaw, Pittman, Potts and Trowbridge. During jury selection, the defense did not exhaust its peremptory challenges and, at the conclusion of the process, pronounced the jury "acceptable." (*Id.*, Ex. 30 at 12.) Under Maryland law, either of these actions waives prior jury objections. *White v. State*, 300 Md. 719, 728–29, 481 A.2d 201, 205 (1984). Booth–El argues that counsel was unaware of the waiver rules and rendered ineffective assistance as a result. He does not allege any particular prejudice from the failure to preserve the objections. Rather, he argues that the failure

to preserve the jury objections is the equivalent of failing to note a timely appeal. (Petition at 137–41.)

Here, as before the post-conviction court, Booth–El premises his argument on *Lozada v. Deeds*, 498 U.S. 430, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991). In *Lozada*, the defendant sought federal habeas corpus relief on the grounds that trial counsel had failed to inform him of his right to appeal, the procedures for filing an appeal, the time limits, or that he had a right to counsel on appeal. The district court denied the petition because the defendant had not stated any grounds that he would have raised on appeal and, therefore, failed to meet the second prong of the *Strickland* test. The United States Court of Appeals for the Ninth Circuit denied a certificate of probable cause. The Supreme Court reversed, noting that a number of Circuits had presumed prejudice in similar situations. *Id.* at 432, 111 S.Ct. at 861–62.

Judge Friedman rejected the presumption of prejudice and, instead, applied the traditional *Strickland* analysis. (State's Answer, Ex. 52 at 29–30.) The Supreme Court has never applied a presumption of prejudice to actions which do not deprive a defendant of the opportunity to appeal but, rather, waive a specific issue. Indeed, in the context of challenges to jury selection not based on ineffective assistance, the Court has required a showing of prejudice. *Ross*, 487 U.S. at 88, 108 S.Ct. at 2278 ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."). Lower courts have applied the traditional *Strickland* analysis to claims for ineffective assistance of counsel for not preserving an issue for appeal. *See Mazzell v. Evatt*, 88 F.3d 263, 269 (4th Cir.

1996) (failure to object to jury instructions). Judge Friedman's application of the traditional *Strickland* analysis, therefore, was not contrary to clearly established federal law.

At the post-conviction hearing, Mr. Hill testified that, at the time of the sentencing proceedings, he was aware that, by failing to exercise all peremptory strikes and pronouncing the jury acceptable, he would waive voir dire objections. (State's Answer, Ex. 30 at 12–13.) Mr. Hill testified that, during voir dire, he consulted Katherine Marks of Jury Selections, Inc., other attorneys in his firm, and Booth–El. (*Id.* at 27–28.) He stated he had a "vague recollection" that the reason he did not use his last peremptory strike was that he was concerned about the person who would then have become a member of the jury. (*Id.* at 30–31.)

Judge Friedman concluded that Mr. Hill had made a tactical decision which, under the circumstances, was not unreasonable. (*Id.*, Ex. 52 at 30.) Her determination is not an unreasonable application of clearly established federal law. *See Fitzgerald v. Thompson,* 943 F.2d at 469.

### 2. Sentencing counsel failed to apply the proper death qualification standards during voir dire

Booth–El argues that, during voir dire, counsel and Judge Angeletti relied upon *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) rather than *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).[44] He identifies three instances in which this misapplication caused the wrongful exclusion or inclusion of a juror.

First, Booth–El argues that one juror, Mr. Levene, was incorrectly excused for cause after stating that he was opposed to the death penalty. After Mr. Levene said he was opposed to the death penalty, Judge Angeletti asked him if he would he be able to impose the death penalty if Adolph Hitler had been convicted of killing twelve million people. Mr. Levene stated he thought he would still oppose it. (State's Answer, Ex. 15 at 128–29.) In an attempt to rehabilitate Mr. Levene, Mr. Hill then asked a number of questions about willingness to follow the law and the court's instructions. (*Id.* at 129–32.) Finally, after allowing the prosecution an opportunity to ask questions, Judge Angeletti inquired whether Mr. Levene could

---

**44.** In *Witherspoon* the Supreme Court found that automatically excluding from a capital sentencing jury all prospective members who opposed the death penalty violated the Due Process Clause. In a footnote, the Court stated:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

391 U.S. at 523 n. 21, 88 S.Ct. 1770. In *Witt,* the Court observed that this language had been relied upon by lower federal courts as a standard for juror qualification and clarified its earlier holding:

> We therefore take this opportunity to clarify our decision in *Witherspoon,* and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

469 U.S. at 424, 105 S.Ct. 844.

"impose the death penalty in an appropriate case." Mr. Levene answered that he could not. (*Id.* at 138.) The prosecution then moved to excuse him for cause. Mr. Hill argued that Mr. Levene should not be stricken because he would be able to follow the court's instructions and the law even though he was morally opposed to the death penalty. Judge Angeletti disagreed, concluding: "It's obvious to the court that he would not impose the death penalty under any circumstance, and therefore would not be a fair and impartial juror to one of the parties in this proceeding." (*Id.* at 141.)

Mr. Hill questioned Mr. Levene in an effort to bring forth opinions indicating that he was not disqualified under *Witt.* He argued that Mr. Levene should not be stricken under the *Witt* standard. Booth–El points to no defects in Mr. Hill's questions or argument other than the fact that Judge Angeletti struck Mr. Levene for cause. Counsel did not render ineffective assistance merely because the trial judge did not rule in his favor.

Booth–El next argues that two jurors, Mr. Grant and Ms. Hopkins, who should have been struck by Judge Angeletti for cause, were not because he improperly applied the *Witherspoon* standard. Again, the only alleged defect in Mr. Hill's performance is that Judge Angeletti did not grant the motions to strike these jurors.

During questioning by Judge Angeletti, Mr. Grant stated that he would not automatically vote either for or against the death penalty and did not have any pre-existing opinion as to the appropriate penalty for Booth–El. (*Id.*, Ex. 18 at 99–101.) Mr. Hill then asked a number of questions concerning circumstances under which Mr. Grant would feel obligated to impose the death penalty. (*Id.* at 101–04.) He then argued Mr. Grant should be stricken for cause. (*Id.* at 104–06.) The request was denied.

During questioning by Judge Angeletti, Ms. Hopkins stated that she could vote for or against the death penalty as the facts and circumstances of the case required. (*Id.*, Ex. 15 at 83.) When Mr. Hill questioned her, she indicated that, under the facts he proffered, she believed the death penalty would be appropriate. (*Id.* at 83–85.) Again, he argued that she should be stricken for cause and, again, his request was denied. (*Id.* at 93.)

Mr. Hill's performance did not fall below an objective standard of reasonableness. He questioned the jurors and asked that they be struck. Standing alone, the fact that Judge Angeletti did not grant the request does not demonstrate any insufficiency on Mr. Hill's part.

### 3. Counsel failed to object to the prosecution's reference to Booth–El as a serial killer

Near the end of his closing rebuttal argument the prosecutor stated:

> Ladies and Gentlemen, it can never be said that a crime like this should go unpunished. No one could call that an act done in the name of justice. Ladies and Gentlemen, the Defendant is the ultimate criminal here. He is a repeated, serial killer. He has committed the ultimate crime and, Ladies and Gentlemen, we ask for the ultimate punishment.

(*Id.*, Ex. 24 at 141–42.) Booth–El argues that his counsel was ineffective for failing to object to the serial killer remark. Judge Friedman found that counsel was not ineffective because the remark was accurate. She noted that, in addition to the robbery/murders of Mr. and Mrs. Bronstein, Booth–El had been convicted of an unrelated robbery/murder which occurred in April 1983. (*Id.*, Ex. 52 at 31.) Her conclusion is not an unreasonable application of clearly established federal law. *See United States v. Brainard,* 690 F.2d

1117, 1122 (4th Cir.1982) (prosecutor may argue facts in evidence and reasonable inferences therefrom).

#### 4. Failure to adequately question a defense witness

During the 1990 sentencing proceedings, Cessie Alphonso, a social worker, testified on behalf of Booth–El. In the course of testifying about Booth–El's background, she stated that "he became truant. He eventually got caught and he was then placed in Boy's Village where he was raped." The prosecution objected and Judge Angeletti struck the answer as unresponsive. (State's Answer, Ex. 23 at 92.) Booth–El now complains that counsel was ineffective for not following up with a different question to elicit the fact that he had been raped. As this argument was not raised as an ineffective assistance of counsel claim at any point in the state proceedings,[45] it is procedurally defaulted.

### D. Sentencing Appellate Counsel

#### 1. Failure to raise the "flip-flop" juror issue

On appeal of the 1990 sentencing proceedings, Booth–El was represented by John Kopolow and Julia Doyle Bernhardt from the Office of the Public Defender. Booth–El argues that they were ineffective for failing to argue that, after being death qualified during voir dire, one juror, Laurel Gilbert, spoke with Judge Angeletti over the phone and told him that she had changed her mind about the death penalty. After advising counsel of this conversation, Judge Angeletti struck Ms. Gilbert for cause. Booth–El also argues that Judge

Angeletti then called Ms. Gilbert to the bench and spoke with her outside the presence of counsel.

Judge Friedman found this claim to be without merit because the transcript demonstrated that Judge Angeletti did not speak with Ms. Gilbert, but received a message from her. Further, the notation on the transcript indicating that counsel had not been present when Ms. Gilbert was questioned by Judge Angeletti was a clerical error. (Id., Ex. 52 at 33, 45.) Factual findings by a state court are presumed to be correct, and a federal habeas corpus petitioner has the burden to rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e). Booth–El has presented no evidence to rebut the presumption.[46]

#### 2. Failure to raise the "serial killer" issue

Booth–El argues that it was ineffective for appellate counsel not to raise the prosecutor's reference to him as a repeated serial killer during closing arguments. For the same reasons she found that it was not ineffective for sentencing counsel to have failed to object to the comment, Judge Friedman concluded that it "was not so prejudicial as to undermine the outcome of the trial." (State's Answer, Ex. 52 at 45.) For the reasons discussed above, this determination was not an unreasonable application of clearly established federal law.

### Fundamental Rights: Claim XVIII

Booth–El next raises a number of claims that he classifies as violations of "fundamental rights which cannot be waived."[47]

---

**45.** It was raised on direct appeal as a claim of error by Judge Angeletti for striking the remark. The Court of Appeals concluded the claim had been waived by counsel's failure to rephrase it or to call Booth–El to testify about the incident. Alternatively, it concluded that if any error occurred, it was harmless. *Booth IV,* 608 A.2d at 185.

**46.** Booth–El simply cites to the sentencing transcript, which was considered by Judge Friedman.

**47.** These claims are a collection of issues which could have been raised on direct appeal of the 1984 trial or the 1990 sentencing. Because they were not raised on direct ap-

## A. Denial of Right to a Fair Trial

### 1. Contamination of the second jury panel

Booth–El asserts that the "contamination" of the second jury panel deprived him of his right to an impartial jury free from outside influences. Judge Friedman considered this claim and concluded:

> As discussed, *supra*, any exposure by the jury to extrinsic evidence was not enough to cause the jurors that actually sat on the jury to answer in the negative about whether or not they could be impartial. The level of exposure was not such as to require that the trial judge excuse the panel. Nor was there any argument that the extrinsic information was so pervasive that venue should have been changed.

(State's Answer, Ex. 52 at 54.) This conclusion is not an unreasonable application of clearly established federal law. *See Ross*, 487 U.S. at 88, 108 S.Ct. at 2278.

### 2. The inclusion of a biased juror, Ms. Graves, deprived Booth–El of a fair trial

Booth–El argues that "the only logical conclusion to draw" from Ms. Graves's expression of fear is that she was "predisposed" to find him guilty and that, therefore, the entire jury panel was contaminated. (Petition at 163–64.) This claim is without basis in fact. Ms. Graves stated that she was afraid because she worked in the neighborhood in which many of the witnesses lived. (State's Answer, Ex. 6 at 53–54.) This statement does not imply a predisposition either way. Indeed, trial counsel testified that he believed Ms. Graves was desirable because she was the type of juror who would be willing to stand up for her opin-

ion should she decide in Booth–El's favor. (*Id.*, Ex. 28 at 56–57.) Because Ms. Graves's "fear" was based on the location of her job and there is no evidence that any of the other jurors worked in the same area, it is unlikely they were "contaminated" by it.

### 3. The voir dire inquiry was prejudiced by Judge Angeletti's refusal to allow Mr. Hill to ask jurors a hypothetical question

During the voir dire of Mr. Grant, Mr. Hill asked a number of hypothetical questions concerning whether Mr. Grant would feel compelled to vote for or against the death penalty if he were convinced that Booth–El had been a principal in the first degree. (*Id.*, Ex. 18 at 102–104.) Judge Angeletti allowed the questions but stated afterwards:

> It was as extraordinarily unfair as any question that has been asked of any juror on voir dire, and the reason being it stops at the point of the decision as to principalship without considering the feeling of the juror with reference to any other mitigating circumstance which might be in evidence. And you completely prevent the prospective panelist from even considering the possibility that there might be mitigating circumstances that have to be considered.

(*Id.* at 105.) Although Judge Angeletti stated that he would not permit the questions to be answered by any other juror, he and Mr. Hill continued their discussion of the questions. (*Id.* at 105–107.) Later, Mr. Hill continued to ask similar questions but added references to the presentation of mitigating evidence. (*Id.* at 122–23.)

peal, the claims were termed "fundamental rights" when raised during the post-conviction proceedings, in order to avoid application of Maryland waiver rules. *See* Md.Code Ann. Art. 27, § 645A(c); *Cirincione v. State*, 119 Md.App. 471, 705 A.2d 96, 115 (1998), *cert. denied*, 350 Md. 275, 711 A.2d 868 (1998).

This claim was procedurally defaulted because it was not raised at any point during the state court proceedings. Moreover, even if it were not defaulted, it is without merit because Mr. Hill was permitted to ask substantially the same question, albeit with a more accurate hypothetical.

## B. Constructive Denial of Right to Counsel

Booth–El asserts that the collective errors committed by his counsel during the 1990 sentencing proceedings and on appeal is "evidence of a constructive denial of counsel." Judge Friedman found this claim to be without merit for the same reasons she had denied his individual ineffective assistance claims. (*Id.*, Ex. 52 at 54.) Her finding is not an unreasonable application of clearly established federal law. *Fisher*, 163 F.3d at 852.

## C. Denial of the Right of Confrontation

Booth–El argues that Judge Angeletti's questioning of Ms. Graves after she had been excused for cause violated his right of confrontation because he was not present for the questioning and counsel was not allowed an opportunity to rehabilitate her. As discussed above, this claim is without merit in light of Judge Friedman's determination that counsel and Booth–El, in fact, were present. (*See* State's Answer, Ex. 52 at 61.)

### *Prosecutorial Misconduct: Claim XIX*

During the 1990 sentencing proceedings two knives were introduced into evidence. One was bent and blood stained. The other had a serrated edge. In closing, Booth–El's counsel argued that, because there was no blood found on the serrated knife, it clearly was not a murder weapon and was introduced by the prosecution to mislead the jury. (*Id.*, Ex. 24 at 74–75.) In his rebuttal, the prosecutor argued that the state had never claimed that the serrated knife was used in the murders but, rather, that it was an item found at the scene of the crime which was introduced for what it was worth. As part of this argument he stated: "You see, life is a little different when you are a prosecutor than when you are a defense attorney. We are stuck with what we have. We are stuck with the facts and what we do is we present what we have." (*Id.* at 119–20.) Defense counsel did not object to this statement.

Booth–El's counsel devoted much of his closing to arguing that it had not been proven beyond a reasonable doubt that Booth–El was a principal in the first degree. As part of this argument he stated that, on cross examination, Sergeant Lamartina had indicated that, during the course of the investigation, the police had developed information that someone else (Darryl Brooks) had admitted to stabbing Mr. Bronstein. (*Id.* at 78.) He also challenged the credibility of both Eddie Smith and Reid in connection with Smith's testimony that Reid had admitted to him that he and Booth–El had killed some white people. (*Id.* at 79–80.) During his rebuttal, the prosecutor argued:

Mr. Doory: It's different being a prosecutor than it is a defense attorney. You see, even in a hearing like this, we are bound by the rules of evidence -

Mr. Hill: Objection, Your Honor.

The Court: Overruled.

Mr. Doory: I can't come in here and tell you what anybody else had to say about this crime except John Booth. Mr. Hill would have you take into consideration the famous Sweetsie in his consideration; he would have you take into consideration the Defendant's nephew, Darrall Brooks. I can't come in here and show you

evidence against them. I can't tell you everything that they had to say. I just present the evidence against Mr. Booth and I present it in good faith.

(*Id.* at 122–23.)

Booth–El's counsel conceded that the murders had taken place during the course of a robbery, a statutory aggravating factor. He then stated:

Mr. Hill: What is not an aggravating factor, Ladies and Gentlemen, is the heinousness of the crime, the severity of the crime, the brutality of the crime. Just the fact, simple fact, sad fact, that the murder was committed during the course of a robbery. That you may not consider as an aggravating factor the heinousness or the brutality or the horror of the 12 stab wounds makes no difference as far as the law is concerned.

(*Id.* at 101.) In rebuttal the prosecutor replied:

Mr. Doory: I will speak to you about the law. I will do everything I can not to misled [sic] you. Mr. Hill, in his closing argument to you, made one egregious, one outrageous, one absolute misstatement of the law. He said that you are not allowed to take into consideration the brutality, the heinousness and the cruelty of the crime for which you are sentencing the Defendant -

Mr. Hill: Objection.

The Court: Overruled.

Mr. Doory: Ladies and Gentlemen, that is one hundred percent, no, that is one thousand percent ridiculous.

(*Id.* at 123.)

Booth–El's parents, June Sparrow and John Booth, Sr., did not testify during the sentencing proceedings. Two of his sisters and a social worker testified about his childhood. They each stated that both parents drank heavily and were frequently absent from the home. Booth–El as the oldest child attempted to care for the others, on occasion stealing milk and bread so they would have food. All three testified that his mother abused him physically and verbally. (*Id.*, Ex. 22 at 4–42, 104–41; Ex. 23 at 60–92.)

While commenting on the testimony of the social worker, the prosecutor stated during his rebuttal argument:

Mr. Doory: . . . and why was she brought in when the people whom she interviewed, who could have presented you with live testimony, who could have been cross examined, why was she asked to do that? Because she makes a far more favorable and impressive advocate than they ever could, and any characteristics inconsistent with the defense's theory, they need not be presented to you in this form of near evidence. Had you met June Sparrow you would have realized that she is not the horrible person she is described -

Mr. Hill: Objection.

The Court: Overruled.

Mr. Doory: Had you met John Booth [Sr.], you would have seen that he is someone who, for all of his faults, provides a fabulous male role model for this Defendant and did in his young, formative years and could have at any time, if that is what the Defendant wanted.

(*Id.*, Ex. 24 at 129–30.)

Booth–El argues that those comments violated his right to a fair trial because they: 1) suggested that evidence not introduced supported the prosecution's case; 2) incorrectly stated that the prosecution and defense played by different rules; and 3)

misrepresented defense counsel's closing argument. This argument was raised on direct appeal.

 For improper comments by a prosecutor to be grounds for federal habeas corpus relief, it is not enough that they be undesirable or even universally condemned; the remarks must have so infected the trial with unfairness that the resulting conviction is a denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). In making this determination, the court looks at "(1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the errors were isolated or repeated." *Arnold v. Evatt,* 113 F.3d 1352, 1358 (4th Cir.1997), *cert. denied,* 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998).

The Court of Appeals found that the first two challenged comments were proper rebuttal. It explained:

> The State was explaining that its case was focused on proof directed toward Booth, while the defense could generate hypotheses generally consistent with the evidence in an attempt to create a reasonable doubt. Further, the State was telling the jurors, in lay terms, that it generally could not introduce the statements of persons who were not party opponents.

*Booth IV,* 608 A.2d at 188. This conclusion is not an unreasonable application of clearly established federal law.

 The Court of Appeals found that the statement that defense counsel had misstated the law was appropriate rebuttal because defense counsel had indeed misstated Maryland law. *Booth IV,* 608 A.2d at 188. Because it is a determination of state law, this conclusion is binding on this court. *Estelle v. McGuire,* 502 U.S. 62,

67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991).

Finally, the Court of Appeals concluded that Judge Angeletti had not abused his discretion in allowing the prosecutor's comment regarding Booth–El's parents:

> Basically the State was presenting in an argumentative fashion the concept that Booth's parents were not the caricatures which the defense had sought to create. This was fair rebuttal. The jury had heard information that Booth's father had served in the Navy. During that period Booth and two of his siblings were born. When the father was discharged, the parents married, the father became one of the first African–American fire fighters in Baltimore City, and the couple purchased a home. The jury had also been told that, while the father was in the Navy, the mother worked as a domestic six or seven days a week, for long hours each day. Ms. Alphonso described Booth's father, at the time of her meeting with him, as a "sensitive, intelligent, highly educated man." One of Booth's sisters said that Booth's father held degrees in mechanical engineering and theology.

*Booth IV,* 608 A.2d at 189. This finding is not an unreasonable application of clearly established federal law. *See Brainard,* 690 F.2d at 1122 (prosecutor may argue facts in evidence and reasonable inferences therefrom).

### Reasonable Doubt Instruction: Claim XX

At the guilt/innocence trial Judge Angeletti instructed the jury:

> The State has the responsibility to offer you proof to overcome that presumption of innocence and to prove that a defendant was guilty of a crime with which he is charged and the degree of proof that it is necessary for the State to produce

is proof that the defendant is guilty beyond a reasonable doubt. This does not mean that the State must prove the defendant guilty beyond all possible doubt or to an absolute or mathematical certainty. The evidence in a criminal case need not be that certain, but it must establish guilt beyond a reasonable doubt.

Reasonable doubt has been defined as follows. If after considering all of the facts and law of the case you can say that you have an abiding belief that the defendant is guilty, a belief such as you would be willing to act upon in an important matter relating to the affairs of your own life, then you have no reasonable doubt.

In the final analysis in order to sustain a verdict of guilty the evidence need not eliminate from your minds every conceivable doubt based on mere guess work or speculation or suspicion but must eliminate from your minds any doubt based on a sound and logical reason.

(State's Answer, Ex. 10 at 28–29.) Booth–El argues that the middle part of this instruction was erroneous and, therefore, violated his due process rights. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt …").

Trial counsel did not object to this instruction. The issue was raised for the first time during the post-conviction proceedings. Judge Friedman concluded that the instructions, when viewed as a whole, were "not bias[ed] nor did they incite misunderstanding of the meaning of reasonable doubt." [48] (State's Answer, Ex. 52 at 63.) This finding is not an unreasonable

application of clearly established federal law. *See Victor v. Nebraska*, 511 U.S. 1, 5–6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994).

### Brady Violations: Claim XXI

Booth–El asserts that the state failed to turn over to him a statement made by Darryl Brooks and the FBI analysis of a pair of gloves found in the Bronsteins' home.

 In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). There are three essential elements to a *Brady* claim: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but, rather, "whether in its absence he received a fair trial, understood as a

---

**48.** Judge Friedman did not find the claim waived by the failure of trial counsel to object, nor by not being raised on direct appeal.

Booth–El properly exhausted this claim by raising it in his application for leave to appeal. (State's Answer, Ex. 53 at 76–77.)

trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

## A. FBI Report

A pair of white gloves was found inside the Bronsteins' home. The gloves, or portions thereof, were sent to the FBI for analysis. The FBI created a report stating that "no hairs of Negroid origin" were found in its analysis. (Petition, Ex. 31 at 2.) Assuming that the first two requirements of a *Brady* claim are met, this evidence was not "material" because there is no reasonable probability that it would have affected the outcome of the trial.[49]

## B. Statement of Darryl Brooks

Darryl Brooks is Booth–El's nephew. At the time of the offense he was 12 or 13 years old. Eventually, he was charged as an adult in connection with the Bronstein murders and pled guilty to robbery with a deadly weapon. (*See* Supp. Answer, Ex. 82, Attached transcript at 63.) He did not testify at Booth–El's trial or sentencing.

Brooks was interviewed by the police on May 21, 1983 and made an oral statement. (*Id.,* Ex. 74, Attachment 1.) On July 21, 1984, he signed an affidavit asserting that a statement he made on June 10th concerning the offense was not true. (*Id.,* Attachment 2.) Booth–El argues that this affidavit and notes by Assistant State's Attorney Ara Crowe, (*see* Petition, Ex. 14), show that Brooks made statements to the police in addition to the one he made on May 21, 1983. He contends that the failure to turn over these statements constitutes a *Brady* violation.

Pursuant to the remand in *Booth V,* a hearing was held on this claim on October 16, 1997, at which Brooks testified that he had made several statements to the authorities implicating Booth–El and that the statements were false. (Supp. Answer, Ex. 82, attached transcript at 6–49.) A number of other witnesses, including Brooks's attorneys, testified that he did not make any statements after the May 21st interview. (*Id.* at 59, 65, 73, 82, 89, 106, 109–10.) Judge Friedman found Brooks's testimony to be "wholly unbelievable." (*Id.,* Ex. 79 at 11.) After reviewing the testimony and other evidence presented, Judge Friedman concluded that the only information the prosecution had were hypothetical proffers made by Brooks's counsel during plea negotiations that were "significantly damaging, not favorable to [Booth–El]." (*Id.* at 14.) She found that no exculpatory evidence had been withheld and, thus, there was no *Brady* violation. (*Id.*)

As discussed above, factual findings by a state court are presumed to be correct, and a federal habeas corpus petitioner has the burden to rebut this presumption with "clear and convincing evidence." *See* 28 U.S.C. § 2254(e). In the instant petition, Booth–El does no more than restate the arguments he made to Judge Friedman. He, therefore, has not met his burden of proof. In light of Judge Friedman's finding that Brooks did not make any statements to authorities after

---

**49.** This claim was first raised in Booth–El's *pro se* amendment to his post-conviction petition. (State's Answer, Ex. 62, attachment at 31–32.) It was not addressed by Judge Friedman in her original decision denying relief. (*Id.,* Ex. 52.) It was raised again in Booth–El's motion to reopen the post-conviction proceedings. (*Id.,* Ex. 61 at 1.) In denying the motion to reopen, Judge Friedman found this claim had been waived because it was not raised in the application for leave to appeal. (*Id.,* Ex. 69 at 14–15.) While she is correct that it was not raised in the application for leave to appeal filed on Booth–El's behalf by counsel, (*see id.,* Ex. 53), it was raised in his *pro se* supplemental application. (*Id.,* Ex. 71, Attachment B at 54–55.) Thus, it appears that this claim was not waived.

May 21, 1983, Booth–El's *Brady* claim is without merit.

### Imposition of Death Penalty in Maryland: Claim XXII

Booth–El asserts that in Maryland, the death penalty is imposed in an unconstitutionally arbitrary, wanton, and freakish manner. In making this claim he relies upon a 1994 analysis entitled "The Report of the Governor's Commission on the Death Penalty—An Analysis of Capital Punishment in Maryland: 1978–1993."[50] According to Booth–El, the report shows that, in many cases involving multiple murders or multiple aggravating factors, the defendant received a life sentence. He argues that, therefore, the death penalty is imposed disproportionately, arbitrarily, wantonly and freakishly. This claim is procedurally barred because it was not presented to the state courts.[51]

### Racial Discrimination in Imposition of Death Penalty: Claim XXIII

■■■ Booth–El argues that the death penalty is imposed in a racially discriminatory manner in Maryland. To prevail on this claim, he "must prove that the decision makers in his case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (emphasis omitted). Booth–El bases his argument solely upon the Report of the Governor's Commission. With regard to racial disparity the Commission found:

> There is no evidence of intentional discrimination in the implementation of the death penalty in Maryland, but racial

disparities in its implementation remain a matter of legitimate concern.

Commentary. The Commission's public hearings produced considerable testimony on the perceived unfairness of the death penalty, particularly on the discriminatory effects of capital punishment on African Americans. This concern focused on what the witnesses believed to be a disproportionately high number of African American capital defendants and a disproportionately low number of African American victims in capital cases. There were, however, no accusations of intentional discrimination, and, indeed, the Commission has found no evidence of any intentional discrimination.

The Commission has attempted to respond to these concerns by gathering as complete data as possible on the race of capital defendants and their victims. The data does not establish discrimination against African American defendants or in favor of White victims; neither does the data disprove racial discrimination. It has not been subject to the type of statistical analysis necessary to determine whether the numerical discrepancies that do appear are statistically significant. That inquiry is appropriate for the legislature to pursue if it wishes. The issue, however, is an extraordinarily difficult one; clear answers are unlikely to be forthcoming, regardless of the resources assigned to the task. How does one determine what variables explain the selection

---

**50.** *Available at* http: //www.sailor.lib.md.us/md/docs/death_pen/ (April 27, 1994).

**51.** In the *pro se* amendment to his post-conviction petition, Booth–El listed as a claim:

> The death penalty in the instant case was sought on the basis of racial bias, and as such is constitutionally disproportionate to

sentences for first degree murder, occasioned in Baltimore City.

(State's Answer, Exhibit 62, attachment at 35.) Although this statement arguably is sufficient to present Booth–El's claim of racial bias discussed below, it does not present the claim of arbitrary and wanton imposition with sufficient particularity. *Baker,* 220 F.3d at 289.

from a very large number of murderers of a very small number of death-sentenced defendants? The Commission did not have the means to determine whether race or some other impermissible variable affects the process. The question remains how Maryland should respond to this state of uncertainty. The Commission believes that the response is for the legislature and the people of the State of Maryland to make.[52]

These statements are not sufficient evidence to support a claim that the death penalty was imposed in this case in a racially discriminatory manner. *See McCleskey,* 481 U.S. at 297, 107 S.Ct. at 1769–70.

### Combined Effect of the Unaniminity Requirement on Principalship and Judge Angeletti's Instructions: Claim XXIV

In his Supplemental Memorandum in Support of Petition for Writ of Habeas Corpus, Booth–El argues that the requirement of a unanimous decision on principalship combined with the jury instructions deprived him of the possibility that at least one juror had reasonable doubts about principalship and could have concluded that that doubt was a mitigating factor. (Pet'r Supp. Mem. at 26–41.) This claim was never presented fairly to the state courts and, therefore, is procedurally defaulted.

### CONCLUSION

For the reasons stated above, the court concludes that the removal of diminished capacity as a result of intoxication as a statutory mitigating factor at Booth–El's 1990 re-sentencing was an unconstitutional *ex post facto* law. The remaining claims raised by Booth–El, however, either were procedurally defaulted or do not provide a basis on which the court can grant relief. Booth–El's Petition for Writ of Habeas Corpus, therefore, will be granted in part.

---

**52.** The Report of the Governor's Commission on the Death Penalty—An Analysis of Capital Punishment in Maryland: 1978–1993, Chapter 7, Finding 10, *available at* http://www.sailor.lib.md.us/md/docs/death_pen/ (April 27, 1994).